Russell BOYD, Appellant,

v.

STATE of Indiana, Appellee.

No. 384 S 113.

Supreme Court of Indiana.

June 24, 1986.

Rehearing Denied Aug. 14, 1986.

Michael T. Forsee, Public Defender, Charles G. Read, Public Defender, Jeffersonville, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Russell Boyd was found guilty by a jury in the Clark Circuit Court of the crimes of burglary, murder, and felony murder. The jury subsequently recommended the death penalty for Defendant. The trial court found that the burglary and murder charges had merged into the felony murder charge and accordingly sentenced Defendant on the felony murder charge only. The trial judge agreed with the findings and recommendation of the jury and sentenced Defendant to death.

Fifteen issues are raised for our consideration in this direct appeal, as follows:

1. constitutionality of the Indiana Capital Punishment Statute;

2. denial of a motion for change of venue from the county;

3. denial of Defendant's motions for a test jury and for individually sequestered *voir dire* of the jury panelists;

4. denial of a mistrial;

5. admission of evidence of Defendant's prior burglary of the victim's house as in a "common scheme or plan";

6. admission of autopsy photos;

7. admission of alleged hearsay testimony;

8. admission of testimony of a witness who had violated a separation of witness order;

9. overruling of an objection to a leading question;

10. admission of testimony allegedly outside the scope of cross-examination;

11. admission of a statement given by Defendant;

12. admission of handwriting exemplars;

13. deferring a ruling on a motion to limit cross-examination of Defendant;

14. sufficiency of the evidence; and

15. procedural error in the trial court's death penalty determination.

Judy Falkenstein, the victim, died by strangulation in the bedroom of her home on West Loma Vista Street in Jeffersonville, Indiana, on Friday, August 27, 1982. An autopsy beginning at 4:30 p.m. that afternoon, by Dr. L.E. McCloud, a pathologist, revealed that the death occurred from two to five hours before the autopsy. Her body was first discovered by her ten year-old daughter, Jennifer. Jennifer had been playing and watching television with a friend at the home of the friend's grandparents, Ernest and Alice Seibel. The Seibel house was on the lot adjoining the back of the Falkenstein's. Mr. Seibel was retired and was doing work around the house. Mrs. Seibel was tending to a customer at her home beauty shop.

Jennifer's mother had told her to call after she had been gone an hour. When she did so, Jennifer got no answer. She tried again ten or fifteen minutes later but still got no answer. She then went back to her home. She entered the house but felt something was wrong because her mother was not answering her. She noticed that $117.00 in cash, which her mother had left on a partition or mantel the night before, was not there. The money was from her mother's paycheck, cashed the day before. Jennifer then looked in her mother's purse to see if the money was there. She also noticed the living room window was open, a couch was moved away from the wall at the window, and clothes that had been folded were messed up. The screen from the open window had been removed during a burglary of the house earlier that week. Jennifer also noticed that some canning her mother had been doing in the kitchen was not finished. Jennifer then found her mother in her parent's bedroom, nude, lying on the floor. A belt was pulled tightly around her neck. The other end of the belt was fastened to a wooden part of the dresser. The belt made her mother appear to be sitting up; she could not fall back to the floor until her daughter managed to slip the noose off her head. Her mother was bruised and cut, and there was blood coming from one nostril. Around the body were the clothes Jennifer had seen her mother wearing earlier in the afternoon. At first Jennifer thought the scene looked like an attempted suicide and she screamed out the window for Mr. Seibel to come and help. She then called an ambulance and her father. She told her father she thought her mother had committed suicide or something like that.

Ernie Seibel rushed over to the house and found Judy Falkenstein as described above. Jennifer was still on the phone. Seibel observed that Judy had a bruise over the left temple, and that blood was coming from her mouth. He found no pulse. Ernie sent Jennifer back to his house, where Alice Seibel's customer looked after her. Alice went to the Falkenstein's to help Ernie.

Judy's husband, Tony Falkenstein, soon returned home, and when he was informed

his wife was dead, said: "Those damned burglars have come back, those damned burglars have come back."

The facts leading up to and surrounding the murder are as follows: The Falkenstein home was burglarized on Monday, August 23, 1982, while the family was out. They did not notice the burglary that night, but on Tuesday Judy called Tony, very upset, and told him about it. A box with several silver coins was missing from his study, as well as jewelry and other items, including class rings. Jennifer was aware of the items missing from her mother's jewelry box because she, herself, kept a silver necklace with blue dots in the box for safe-keeping. The burglar had entered the home by pulling the window screen from a living room window. After the burglary, Tony Falkenstein became obsessed with checking the windows at night to see if they were locked. A neighbor reported to police that he had seen a man in the neighborhood who was later identified as Defendant.

Testimony revealed that Defendant had been talking to his friends, particularly Cynthia Cardwell, about a man who owed him $700.00. Defendant often came to see Cynthia and talked a lot. She and Defendant, as well as Gayle Voyles and Jessie Yates, socialized a lot in the month before Defendant's arrest. Some of Defendant's talk was about violence. He talked about people he was angry with and described very violent acts he would take against them.

Defendant also talked to his friend Jessie Yates about the man who owed him $700.00. On Tuesday, August 24, Defendant saw Jessie driving by and flagged him down. Defendant had with him at that time a silver box like a file box, and a jewelry box. He said he watched two men unload an empty bank bag from a van, leaving the grey box behind. Defendant said he came out of hiding when they left and picked up the box. He gave Jessie the white box for Jessie to give to another acquaintance, Debbie Moock. Defendant told Jessie the grey box contained old coins

and money. Debbie Moock received the white box, which contained jewelry. She particularly recalled one necklace with turquoise or jade. She also identified two other exhibits as being necklaces from that box.

On Wednesday, August 25th, Defendant was again riding with Jessie. They went down Middle Road and passed West Loma Vista Drive, and Defendant pointed down that street and said that was where the guy lived who owed him $700.00.

On Thursday, August 26, Defendant, who was unknown to Ernest Seibel, approached Seibel and started talking, saying he was interested in renting a place. A little while after this brief conversation, Ernie noticed the man, who had no evident transportation, walking away across a nearby field. Alice Seibel also saw Defendant come across the field. He had gone to the Falkenstein house and peered into the window, shading his reflection with his hand. Her testimony revealed that this was the same window that was entered by the burglar. About fifteen minutes later, Alice saw that Judy Falkenstein had returned home and was outside talking to Defendant.

That same day, Judy's mother, Rosalie Stricker, brought Judy her paycheck from their mutual place of employment, where Rosalie was payroll clerk. Despite the burglary, Judy left $117.00 on the partition or mantel.

Also on Thursday, Defendant came to Cynthia's house and talked about the man who owed him $700.00. He said he was going to see to it that the man paid it. Also on that same day he said he had found some old coins that he wanted to cash in, and would use the proceeds to have a cookout. He carried a pillow case full of goods which he said he had gotten from the man who owed him $700.00 because the man could not come up with the money. He said the man let him take the goods in place of the money. The pillow case contained some gold chain, blue jeans, cassette tapes, calculators, jewelry, a high school ring, a clock, a camera, and some food.

Gayle Voyles also was present when Defendant talked about getting these goods from the man who owed him $700.00. Defendant also said he was going to collect more on Friday.

On Friday, August 27, Defendant was at Cynthia's but left, catching a ride with Debbie Moock. At his request, she dropped him off at Middle Road to get the money that was owed him. This was a short distance from West Loma Vista Drive and the Falkenstein residence. Several people living in the area saw Defendant, wearing a red jacket, walk through the neighborhood across a field from the Middle Road area. This was about 1:30 or 2:00 p.m. Albert Brightwell specifically mentioned that Defendant went through an area of mud and standing water. This is significant since mud was found on the Falkenstein's master bedroom floor and on the body of Judy Falkenstein.

Defendant later returned to Cynthia Cardwell's. Judy Smith also was there. Defendant was wet up to his knees, was perspiring, and appeared nervous. He reached into his pocket and showed Cynthia a wad of money, but put it back quickly as if he did not want Judy to see it. After Judy left, he immediately pulled out the money and gave Cynthia some that he owed her. He said he had to do away with a woman to get it, but Cynthia did not believe him at that time. She permitted Defendant to take a shower and change into a fresh T-shirt.

That night, Friday, August 27, Defendant was at Jessie Yates' house. He asked Jessie if he remembered him talking about the man who owed him money. Defendant told Yates that he went over to collect some property because the guy would not come up with the money, and while there, a lady walked in on him. He said he made her disrobe so she would not run to the neighbors. He said he heard a car come into the driveway while he was gagging her, so he put a belt around her neck, fastened the belt to a doorknob, and ran downstairs. He said he hit whomever came to the kitchen door with a skillet and

left. He further said the woman was alive when he left, even though her tongue was hanging. He later told Yates that he had spent $100.00 that day.

The next day Defendant showed Jessie a newspaper picture of the composite sketch the police had assembled from the neighbors' description, and asked if it looked like him. The picture was in connection with an article about a woman who was slain. Defendant said she was still alive when he left and he didn't kill her, but the door must have closed and strangled her. That afternoon he also showed the composite sketch to Cynthia Cardwell. He pointed to the sketch and said, "That's me." He explained that the stuff he had brought over had not come from the dead woman's house, but he said he had to do it because she walked in on him.

Cynthia told him to get all of his stuff and get it out of her place. She told Jessie, who also was there, to get Defendant away from her. Defendant indicated he was going to get in touch with a Tim Murphy for help in getting out of town. Cynthia then decided to go to the police. Cynthia, Cynthia's mother, and Gail Voyles went to the police and took with them some things Defendant had left behind, including jewelry from the pillow case which he had said contained stuff taken from the man who owed him money. Cynthia later identified these items in court. The police also retrieved items from Jessie and Debbie that Defendant had left with them. The victim's family identified some of these items as either being, or looking like, property stolen from the Falkensteins' house in the first burglary earlier that week. In particular, Rosalie Stricker identified the silver and turquoise necklace she had bought for her daughter two years earlier on a trip to Albuquerque, New Mexico.

Defendant was arrested early on August 29, and on that day gave a statement to police insisting that he had stayed at Cynthia Cardwell's all Friday afternoon from 12:30 to 3:30 p.m. On the next day he gave another statement to correct some aspects of the earlier one. In the second state-

ment, on August 30, he admitted being in the Falkenstein's house at about 1:30 or 1:45 p.m., but claimed he was looking for a home for an acquaintance, and said he had talked to a man in the neighborhood about that the day before. He said he had learned the Falkenstein house was going to be empty, so he went into their yard and the woman who lived there came home. He talked to her about a friend named Ferguson being interested in renting in the area, and she asked him for Ferguson's name and phone number. He said he returned to the house on West Loma Vista at about 12:30 p.m. on Friday and, seeing the door open, walked in. He went up the stairway and discovered the body of a woman lying naked with a belt wrapped around her neck in the bedroom. That scared him because she showed no signs of life so he immediately left. He said he wanted this to be understood because he feared there was the possibility of the death penalty and he wanted to tell the truth. He admitted being in the house one afternoon earlier in the week to burglarize it, and taking jewelry which he gave to Debbie and Cindy. He also admitted taking silver coins.

## I

Defendant claims the Indiana Capital Punishment Statute is unconstitutional in several respects. His contentions have been decided by this Court and the United States Supreme Court adverse to his position on several occasions.

Defendant claims the Indiana system fails to give adequate proportionality review and fails to inform the jury of the range of determinate sentences thereby making the death penalty a cruel and unusual sentence. We explained in *Burris v. State* (1984), Ind., 465 N.E.2d 171, 192, reh. *denied* (1984), U.S. *cert. denied* (1985), —— U.S. ——, 105 S.Ct. 816, 83 L.Ed.2d 809, that this Court's procedure and practice fully satisfies the requirements set out by the United States Supreme Court in *Gregg v. Georgia* (1976), 428 U.S. 153, 206, 207, 96 S.Ct. 2909, 2940, 2941, 49 L.Ed.2d 859, 893,

*reh. denied* (1976), 429 U.S. 875, 97 S.Ct. 197, 50 L.Ed.2d 158, to afford meaningful and systematic appellate review of each case in which capital punishment has been chosen. In *Gregg*, the United States Supreme Court favorably mentioned the Georgia Supreme Court's formal procedure to collect data on murder cases and consider punishment in light of proportionality, but nowhere did it require actual proportionality review. Rather, in *Pulley v. Harris* (1984), 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29, 36, the United States Supreme Court held that such review is not necessary and that the Eighth Amendment to the United States Constitution does not require a state appellate court to compare the sentence in the case before it with the penalties imposed in similar cases. The Court stated in *Pulley*, 465 U.S. at 53, 104 S.Ct. at 881, 79 L.Ed.2d at 42:

> "The statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances in each particular case."

Indiana's statutes and procedures do this and meet all the requirements of proportionality review set out in *Gregg* and *Pulley*. Since it has been established in this State that the jury's participation in the death penalty is advisory, it need not be informed as to the range of sentences possible. *Burris*, Ind., 465 N.E.2d at 189; *Williams v. State* (1982), Ind., 430 N.E.2d 756, 758. In this cause, however, the jury was fully informed at the penalty phase of the trial of the penalties available in addition to the death penalty.

Defendant's claim that the death penalty is also violative of Art. 1 § 18 of the Indiana Constitution, which prohibits vindictive justice, has already been decided by this Court adverse to that contention in *Dillon v. State* (1983), Ind., 454 N.E.2d 845, 852, U.S. *cert. denied* (1984), 465 U.S. 1109, 104 S.Ct. 1617, 80 L.Ed.2d 145.

Defendant questions whether a defendant can properly be sentenced in a capital case on the recommendation of the same jury which just adjudicated his guilt; however, he cites no authority in support of the issue. He therefore has waived this issue. Ind.R.App.P. 8.3(A)(7). We held in *Judy v. State* (1981), 275 Ind. 145, 166, 416 N.E.2d 95, 107, however, that where the same transaction and facts were involved, a jury could consider the evidence for guilt, and then without prejudice hear the evidence on capital punishment. More recently, we held in *Dillon*, Ind., 454 N.E.2d at 852, that the penalty phase is not a separate guilt determination requiring a new jury; that the use of standard evidentiary rules and adherence to the standard of proof beyond a reasonable doubt insures protection of fundamental fairness and due process. *Gregg*, 428 U.S. at 191–192, 96 S.Ct. at 2933–2934, 49 L.Ed.2d at 895, also supports this procedure, finding it desirable for the jury to have as much information before it as possible when it makes a sentencing decision. The sentencing hearing is simply a continuation of the same proceeding and is not a separate trial. The jury heard all of the facts of this case and thus was in a position to determine the nature of the offender and the manner in which the offense was committed, and could therefore make a well informed determination as to aggravating and mitigating circumstances. There was no error in this procedure.

## II

■ Defendant contends it was error to deny his Motion for Change of Venue, claiming pre-trial publicity prevented his having a fair trial. Error is committed in the denial for change of venue to a more distant location only if the local venue was so prejudiced that the denial amounted to an abuse of discretion. *Williams v. State* (1979), 270 Ind. 426, 429, 386 N.E.2d 670, 672, *reh. denied* (1979); *Mendez v. State* (1977), 267 Ind. 309, 312, 370 N.E.2d 323, 325. The State contends the publicity in this case was neither extensive nor prejudicial. The trial court's exercise of discretion regarding such a motion will be set aside only on an abuse of that discretion. *Id.*

■ It is not the amount of publicity that determines whether a jury is prejudiced. The court, in determining this issue, must apply the standard of whether the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd* (1961), 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751, 756. We cannot presume merely from the amount of pre-trial publicity the case has generated that the trial was inherently prejudicial in the absence of a trial atmosphere utterly corrupted by press coverage. *Murphy v. Florida* (1975), 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589, 594; *Drollinger v. State* (1980), 274 Ind. 5, 13, 408 N.E.2d 1228, 1235.

■ Defendant's claim is based on the fact that thirty-nine prospective jurors had some knowledge of the case. Seven of these were acquainted with, or relatives of, the victim's family or a major witness. The rest had read or heard about the case. Few expressed any reservations about their ability to decide the issue impartially and on the basis of properly admitted evidence. The general community knowledge of this case was demonstrated by only a few potential jurors who doubted their ability to serve impartially, and these were instances of jurors with some personal relationship to the victim, all of whom were excused in any event. All the publicity alluded to by Defendant, except for one article which appeared when the Motion for Change of Venue was filed, occurred approximately one full year before the trial. The trial court found in its denial of the Motion for Change of Venue that the pre-trial publicity did not result in such a general atmosphere of prejudice in the community that it would prevent the calling of an impartial jury. We see no error in that determination.

## III

Defendant moved for a "test jury," and also moved for individually sequestered

*voir dire* of each juror. The court denied both motions.

Defendant cites us to no authority for a test jury, and we know of none. Such a body is unknown to our legal process. Defendant does not tell us how it is to be drawn, constituted, or to deliberate. We find no error in the court's denial of this procedure. We have held also there is no right afforded to a defendant to have each juror separately sequestered and questioned outside the presence of the other jurors. *Smith v. State* (1984), Ind., 465 N.E.2d 1105, 1115, *reh. denied* (1984); *Burris*, Ind., 465 N.E.2d at 180. Here, as in *Smith* and *Burris*, there is no showing of any manner in which the *voir dire* of the jury was actually prejudiced by not being conducted separately. There is no showing that any of the jurors blurted out or discussed matters that could have tainted or prejudiced the other potential jurors being questioned at the time. We therefore find no grounds for determining that the trial court abused its discretion in denying this particular procedure.

IV

Defendant claims the trial court erred in denying a mistrial because of three instances where there was an allusion to Defendant's past criminal conduct. Two of the remarks occurred during the State's examination concerning Defendant's understanding of his *Miranda* rights. Detective Crump stated that Defendant said he understood his rights because he had been incarcerated before. An objection was made and sustained and the trial court admonished the jury at Defendant's request. The trial court then *voir dired* the jury as to whether they could disregard the statement. All of the jurors answered in the affirmative and no further curative measures were made. The second was a remark by a lay witness that Defendant used to talk to her about a lot of things, including his past brushes with the law. The trial court granted a similar objection and motion for admonition, and cured it in the same manner. Defense counsel specifi-

cally acknowledged that this cured his objection. The third such statement was made by Detective Mangles when the prosecution asked Mangles whether Defendant understood his rights. Mangles stated: "He said he had signed this before and he had no problem with it." At this instance, following the sustaining of Defendant's objection and granting an admonition to the jury, the trial court conducted the same sort of *voir dire* as it had done previously. At this point, Defendant moved for a mistrial and this motion was denied.

The granting of a mistrial lies within the sound discretion of the trial court, and its determination will be reversed only where an abuse of that discretion can be established. *Ramos v. State* (1982), Ind., 433 N.E.2d 757, 759, *reh. denied* (1982). The declaration of a mistrial is an extreme action and is warranted only when no other action can be expected to remedy the situation. To prevail, the defendant must show that he was placed in a position of grave peril to which he should not have been subjected. *Gambill v. State* (1982), Ind., 436 N.E.2d 301, 304; *Ramos*, Ind., 433 N.E.2d at 759.

When the jury is admonished by the trial judge to disregard what has occurred, or if other reasonable curative measures are taken, the court's refusal to grant a mistrial will not be reversible error unless it can be shown that irreversible prejudice has resulted. *Tinnin v. State* (1981), 275 Ind. 203, 206, 416 N.E.2d 116, 118. Furthermore, the admission of inadmissible and irrelevant evidence, even evidence of prior criminal acts, may be harmless error where the conviction is supported by substantial or overwhelming evidence of guilt. *Brewster v. State* (1983), Ind., 450 N.E.2d 507, 510. Here, the trial court thoroughly examined the jury and insured they were not prejudiced by the remark. More importantly, however, the evidence established Defendant's guilt to a substantial and overwhelming degree. Defendant admitted to at least two of his acquaintances that he had killed a woman that afternoon, that he had been in a house and choked a

woman with a belt, and that he was in the house at the relevant time but found the body already dead. Furthermore, he admitted to the police that he had gotten the goods he handed out to friends by burglarizing the victim's house on Monday of that same week and that he had intended to go back on Friday and get more in the same manner he acquired the earlier lot. In view of all the circumstances before the jury and the trial judge at this juncture, we cannot say the trial judge committed reversible error by denying the motion for mistrial.

### V

The trial court first granted Defendant's motion *in limine* to prevent any evidence of Defendant's first burglary on the Falkenstein house. The State later moved to have this order modified to admit evidence about the earlier burglary and the court granted the motion. The trial court specifically held that the order was relaxed to allow testimony with regard to intent, motive, identification or common scheme or plan. We hold the trial court properly did this. *See Clarkson v. State* (1985), Ind., 486 N.E.2d 501, 506.

■■■■ Defendant basically contends that since the trial court earlier had refused to join the two incidents for trial they were therefore not similar enough to qualify for treatment under the common scheme or plan exception. The trial court had earlier refused to join the two causes apparently on the grounds the prior burglary was not a consequence of the later burglary or conceived with any idea to commit a second crime on the same premises so far as the State could show. This, however, is irrelevant to the issue of common scheme or plan in the trial of this case. Defendant admitted burglarizing the Falkenstein house earlier in the week, of distributing the proceeds of that burglary among his friends, and claiming he was going to return to the same place and get more payment on a debt he said was owed to him. He finally did go back to the Falkenstein's on Thursday and talked to Judy Falken-

stein, and again on Friday before the body was discovered by Jennifer Falkenstein. The only thing he did not admit was killing Judy Falkenstein, whom he said he found dead in the bedroom. The trial court properly found the prior burglary and comments about the property he got from it and how he was going to collect more, were clearly relevant to show motive and intent. Common scheme is shown by Defendant's gaining access to the place by the same window that he used the first time he was there. The two entrances to the Falkenstein home were linked by common motive, that of burglary. Defendant returned to the same place to steal again, and this time it resulted in murder. The evidence of the prior burglary therefore was relevant because it tended to show the identification of the defendant as the one who had the common scheme and motive to return to Falkenstein's for a further burglary following the success of the first act. There was therefore no error in the admission of this evidence.

### VI

■■■■ Appellant claims it was error to admit certain photos, claiming they were gruesome, prejudicial, and cumulative. A photograph is competent evidence if it is a true and accurate representation of that which it purports to depict. *Wiles v. State* (1982), Ind., 437 N.E.2d 35, 38, *reh. denied* (1982) It is necessary only that a witness familiar with what is depicted establish that it is a true and accurate representation; relevance is further determined by whether a witness would be permitted to describe what the photograph depicts. *Murphy v. State* (1977), 267 Ind. 184, 194, 369 N.E.2d 411, 416, *reh. denied* (1978); *Johnson v. State* (1972), 258 Ind. 648, 654–655, 283 N.E.2d 532, 536.

■■■■ Here, the pathologist who conducted the autopsy identified the autopsy photographs after describing the scenes depicted by them. Further support was given to the other photographs by a police officer at the murder scene. Even though photographs depict gory, revolting, or in-

flammatory details of the crime, this is not a sufficient basis for excluding them as evidence. *Drollinger,* 274 Ind. at 18, 408 N.E.2d at 1237; *Wilson v. State* (1978), 268 Ind. 112, 117, 374 N.E.2d 45, 48. The trial court has considerable discretion in the decision to admit photographic evidence, and its decision will be reversed only where it can be shown that such discretion was abused. *Akins v. State* (1982), Ind., 429 N.E.2d 232, 236, *reh. denied* (1982); *Crane v. State* (1978), 269 Ind. 299, 303, 380 N.E.2d 89, 92. The photographs here showed the multiple injuries on the body of Judy Falkenstein, and showed how the body was located when it was discovered. The autopsy scene photographs permitted more clinical depiction of her injuries. These photographs were taken before the actual autopsy was performed and none of them demonstrated the autopsy in progress, or showed any incisions or insertions resulting from it. All of the photographs clearly were aids to the jury in determining the issues before it, and were not such that they would be calculated to unreasonably inflame or impassion the jury. There is therefore no showing that the trial court abused its discretion in their admission.

## VII

Defendant claims there were several instances of hearsay testimony admitted over his objection. Officer Crump testified that he obtained the name of a suspect after an interview of State's witnesses. He was allowed to give the Defendant's name as that suspect. He did not testify to any of the conversation or statements of State's witnesses. Witness Ernest Seibel was allowed to testify that the victim's daughter, Jennifer, hollered out the window at him that it looked like the victim had attempted to commit suicide. Seibel also was permitted to testify that when the victim's husband was advised of his wife's murder, he fell to his knees and made the statement, "Those damn burglars came back." Husband Tony Falkenstein was allowed to testify that the victim had shown him a note from some person expressing interest in buying their residence, but that he, Tony, did not want anything to do with the person and threw the note away. The name on the note was not that of Defendant, although the evidence later inferred that the note was left by Defendant while he was at the residence on Thursday. Defendant claims the admission of each of these items of evidence was hearsay and was prejudicial to him to the extent of being reversible error.

The trial court has inherent discretionary power on questions of admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Emory v. State* (1981), Ind., 420 N.E.2d 883, 884. Hearsay is a statement made out of court, offered to establish the truth of the matters asserted in that out of court statement, resting upon the credibility of the out of court declarant. *Southard v. State* (1981), Ind.App., 422 N.E.2d 325, 329, *reh. denied* (1981), *tr. denied* (1981); *Simmons v. State* (1978), 175 Ind.App. 333, 337, 371 N.E.2d 1316, 1320. There are numerous exceptions to the admissibility of such a statement, one being when it is admitted as evidence of the subsequent investigation by the police. *Rhoton v. State* (1985), Ind., 486 N.E.2d 495, 496. Another exception is where the statement is admitted as an excited utterance or as the spontaneous result of the event, and not the result of reflective thought. *Corder v. State* (1984) Ind., 467 N.E.2d 409, 414. There is also an exception where the out of court declarant is available for cross-examination. *Patterson v. State* (1975), 263 Ind. 55, 58, 324 N.E.2d 482, 484–485.

By definition, Officer Crump's testimony was not hearsay since he did not testify regarding any statements made to him by witnesses which were offered for the truth of the matters asserted. His testimony indicated only how he obtained the name of a suspect. Furthermore, this testimony was an explanation of his subsequent investigation. Witness Seibel's testimony regarding comments of Jennifer and Tony at the scene did not represent any

direct testimony against Defendant. These comments were excited utterances by family members upon discovery of the victim's death. Tony's alleged hearsay testimony concerned only what he did with a note, what he said he would do with the note, and why. It made no reference to any conversation with his wife regarding her gaining possession of the note or her identification of Defendant as the one who delivered it. Finally, all of the out of court declarants testified in court and were fully cross-examined on these and other matters. We see no prejudice to Defendant by any of these statements. Defendant presents no reversible error in the court's permitting these alleged hearsay statements.

### VIII

In cross-examination of Detective Sergeant Crump, Defendant sought to establish that Crump had violated the trial court's separation of witnesses order. The record shows that Officer Crump, as the police officer who had developed certain witnesses for the State, had discussed with them what time they needed to come to testify, and their transportation needs to do so. There was no discussion of the trial between Crump and these witnesses. Based on this, Defendant claims he was entitled to have the entire testimony of this witness stricken. His only authority on this point is *Kelley v. State* (1948), 226 Ind. 148, 78 N.E.2d 547. He acknowledges that *Kelley* holds that separation orders are entirely discretionary, are granted as a favor, and that the trial court has discretion to allow a witness to testify even though he was disobedient to the order. *Id.*, 226 Ind. at 151, 78 N.E.2d at 549. There is no showing here that Officer Crump was disobedient to the court's order, and certainly no showing that Defendant was in any way prejudiced by the trial court's action in allowing the witness to testify. No reversible error is presented.

### IX

Defendant claims the trial court erred in admitting into evidence over his objection certain items of evidence and testimony.

During the testimony of State's witness Seibel, the following question was asked: "Mr. Seibel is there any doubt in your mind that the defendant is the same person that you saw in the front yard and in the pasture?" Defense counsel objected to this question as a leading question. The trial court overruled the objection and permitted the answer. Defendant claims this question suggested the desired answer to the witness and was formulated to ascertain a material fact by a conclusive answer of a simple yes or no. *Brown v. State* (1939), 216 Ind. 106, 23 N.E.2d 267; *Chatman v. State* (1975), 164 Ind.App. 97, 326 N.E.2d 839, *reh. denied* (1975). At this point in the testimony the witness had already identified Defendant as the one he saw in the yard. The trial court, in its discretion, could have decided that the question and answer had enough probative value to admit it regardless of the manner in which the question was asked. *See Wagner v. State* (1985), Ind., 474 N.E.2d 476, 490. In view of the previous testimony of this witness, we find neither an abuse of discretion nor resulting prejudice to Defendant meriting reversal.

Defendant further objected to the admission of Exhibits Nos. 62–72, and Exhibit No. 76, clothing, jewelry, and other items either removed by the police from the scene of the crime or given to the police by friends of Defendant. Defendant claims there was both a violation of the chain of custody rule and that many of these items were not relevant. The chain of custody rule applies with diminishing strictness as the exhibits concerned become decreasingly susceptible to alteration, tampering, substitution, or fungibility. *Parks v. State* (1979), 270 Ind. 689, 694, 389 N.E.2d 286, 290; *Pollard v. State* (1979), 270 Ind. 599, 611, 388 N.E.2d 496, 505; *Wilson v. State* (1975), 263 Ind. 469, 481, 333 N.E.2d 755, 762, *reh. denied* (1975). Defendant concedes that the foundation for introduction of physical evidence whose characteristics can be identified by eyewitness identification is fulfilled when the witness is able to

identify the item and the item has relevance to the issues of the case. *Parks,* 270 Ind. at 694, 389 N.E.2d at 290. Non-fungible items do not require the high degree of scrutiny that must be applied to fungible items. *Wilson,* 263 Ind. at 481, 333 N.E.2d at 762.

Detective Smith identified Exhibits Nos. 62 to 65 as items of jewelry which he recovered during his investigation. He gave evidence as to how he collected, marked, preserved, and identified them. Exhibits Nos. 66–71 were clothing items Smith recovered and he summarily identified them. Exhibit No. 72 was a pair of gloves and Exhibit No. 76 was a red jacket in a shredded condition.

Defendant's argument attacking the jewelry and clothing items recovered from the death scene is not directed to a contention that they might have been substituted, tampered with, or misidentified by the witness who sponsored them, but is actually an objection that they were not shown to be relevant. The basis for his argument seems to be that some of them were identified only as looking like or being identical to items owned by the deceased. He also claims that in some instances these items were not shown to have been connected with the crime, were not property of the victim, or were not items taken from the Falkenstein home.

■ Exhibits Nos. 66, 67, and 68 were definitely identified by the victim's husband as her clothing. They were found around the body and matched the description of the clothing she had worn and therefore were relevant. Exhibit No. 64, a silver and turquoise necklace, was identified by the victim's mother as one she bought for the victim as a gift in Albuquerque. Exhibit No. 62 was identified by the victim's husband as a necklace that looked just like one of his wife's. He further testified that Exhibit No. 65 looked like the box in which she kept her jewelry, which he said he definitely saw on the previous Sunday. He could not identify Exhibit No. 63, but could identify the rest of the items of women's clothing as looking like or being identical to items his wife owned.

■ Evidence is relevant if it is material to an issue in a case and tends to make a desirable inference more probable. Evidence is relevant if, in light of general experience, it logically tends to prove or disprove some issue of fact. The trial court is, of course, afforded wide latitude in ruling on relevancy of evidence. *Armstrong v. State* (1982), Ind., 429 N.E.2d 647, 651.

■ The items of jewelry were identified as those given to witnesses by Defendant, who told the witnesses the items came from the house of a man who owed him $700.00. Exhibit No. 63 was among these items. Defendant claims Exhibits Nos. 71, a pair of gloves, and 76, the red jacket, were objectionable since Detective Smith testified they were sent to the Indiana State Police Laboratory and no witness from that organization testified as to their handling and labeling there. Both items were singularly identifiable, however, and were, in fact, marked and identified by the police officer witnesses. The items were sent away and returned under the same case designation. There was evidence from the witnesses that these items were the ones originally obtained by the police, and remained in a substantially unchanged position. This was sufficient for their admission. *Woodard v. State* (1977), 267 Ind. 19, 24, 366 N.E.2d 1160, 1164.

■ Defendant further objected to the admission of items contained in a pillow case which he had taken to State's witnesses, among whom was Cynthia Cardwell. The items in the pillow case were those taken from the first burglary of the Falkenstein home and were identified by witness Cardwell. These items were admissible with reference to their connection with the first burglary discussed in this opinion in section 5 above.

■ Defendant further contends, however, some of the items in the pillow case were objectionable since they did not match the description given to the police of items

stolen from the Falkenstein house during the earlier burglary, and might therefore give inference to the jury that he had been committing other burglaries elsewhere. The State contends there is another logical inference the jury could draw from these items. The evidence showed Defendant had taken a few easily carried items from the Falkenstein house, and the burglary was not even discovered until the next day. Therefore, minor items such as cassette tapes and some food might not even have been missed by the Falkensteins in the short time between the first and second entry. Therefore, inference does not require the extra items to be explained by supposing that unrelated crimes had been committed by Defendant. As we already have pointed out, Defendant himself admitted he had gone into the Falkenstein house on the previous Monday and taken items from there that he gave to the witnesses. The witnesses testified these items surfaced in the pillow case in question. There was no testimony of other burglaries, and the additional items Defendant complains of were typical household items, insignificant in their incriminating character. The facts and circumstances here do not rise to the level of reversible error.

## X

■ During the re-direct examination of State's witness Jessie Yates, the witness testified as to statements Defendant had made to him. Defendant objected to statements he allegedly made to Yates about "wasting" people, on the grounds that the testimony was irrelevant and beyond the scope of cross-examination. The question referred to how Defendant said he intended to do away with a person named Colleen and one named G.L. Defendant concedes that the scope and extent of re-direct examination are within the discretion of the trial court, citing *McDonald v. State* (1976), 264 Ind. 477, 346 N.E.2d 569. As the State points out, even the erroneous admission of evidence is not prejudicial if similar evidence has been admitted without proper objection. *Hazzard v. State* (1980), 274 Ind. 679, 682, 413 N.E.2d 895, 898.

Cynthia Cardwell was permitted to testify to the exact same statements by Defendant without objection. There is, therefore, no prejudice to Defendant and no reversible error.

## XI

Defendant first gave the police a statement in which he denied ever having been in the Falkenstein home. He gave a second statement to the police on August 30, in which he admitted the first burglary of the Falkenstein home and admitted he was in the home the day of the murder, but stated Mrs. Falkenstein had already been murdered before he arrived there. He now claims the August 30 statement was involuntary and should not have been admitted into evidence. There are two main bases for Defendant's contention that the statement was involuntary. One is that although he had just had an attorney appointed for him for the arraignment when he asked to talk to the police about his prior statement, they took the subsequent statement without the presence of a lawyer and at the end of the statement when Defendant said he wanted to talk to his lawyer, the police did not thereafter call the lawyer in. Defendant acknowledges he initiated the conversation resulting in this second statement of August 30. Defendant does not claim any statement was taken from him after he said he wanted a lawyer. All questions ceased immediately at that moment and there was no attempt by the State to introduce any statement made after he asked for his lawyer. Defendant complains only that the police did not arrange for him to see his lawyer at that time. He alleges nothing in the way of harmful results from the failure of the police to call his counsel immediately, rather than letting him visit later. Defendant claims that even though he initiated this conversation, it was improper for the police to proceed with it without the notification or presence of his newly appointed counsel.

Testimony before the trial court showed that the officers delivered clear, understandable warnings of Defendant's rights,

and several times during the statements stopped Defendant and warned him that he could have counsel present and asked if he wanted to talk with his lawyer. He stated at those times he did not wish to do so at that time and that he would let them know if the need arose. The United States Supreme Court in *Michigan v. Mosley* (1975), 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320, stated:

"A blanket proscription against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigation activity and deprive suspects of an opportunity to make informed and intelligent assessments of their interest."

The Supreme Court further provided a defendant, having invoked his right to counsel, may validly waive that right. *See North Carolina v. Butler* (1979), 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292. Significantly, in 1981 the United States Supreme Court said in *Edwards v. Arizona* (1981), 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1884, 1885, 68 L.Ed.2d 378, 386, U.S. *reh. denied* (1981), 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984:

"Having expressed his desire to deal with the police only through counsel, [Defendant] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police."

 The reason Defendant desired to talk to the police after the arraignment is that he learned he was subject to the death penalty. He thought his better strategy therefore would be to withdraw his former total denial and admit to the police those things they already knew. Defendant was aware that witnesses to whom he had delivered goods from the Falkenstein house were available to testify, and that he had been seen in the neighborhood, since a composite drawing in the newspaper looked very much like him. He therefore wanted to admit to the police everything except the killing of Judy Falkenstein. There was, therefore, nothing improper in the police responding to Defendant's request to make a statement, even though his newly appointed counsel was not present.

In reviewing issues regarding the admissibility of a statement and the ensuing waiver of rights in doing so, this Court looks to the totality of the circumstances existing at the time the statement was taken. *Ball v. State* (1981), 275 Ind. 617, 620, 419 N.E.2d 137, 140, *reh. denied* (1981). In determining whether the statement was voluntary, we look to the circumstances surrounding its giving to determine whether it was induced by violence, threats, promises, or other improper influences. We review the trial court's ruling on this issue, examining only the evidence most favorable to that ruling when the evidence is in conflict, to determine whether the probative evidence supports that ruling. *Jackson v. State* (1981), Ind., 426 N.E.2d 685, 688; *see also Peterson v. State* (1983), Ind., 453 N.E.2d 196, 198.

Defendant claims the police offered him a deal for his statement. Police officers explicitly stated, however, there were no deals, promises, threats, or inducements of any kind. The only alleged promise made to him was the statement of Detective Mangles that if he gave a statement things might go easier on him. Defendant did not make it clear which of his statements this referred to. Detective Mangles claimed he did not say this to Defendant at either of the statements. Therefore, that evidence was in conflict.

 The second contention is that Detective Mangles coerced Defendant by reminding him of the monkey that was on his back and that aggravating circumstances for a capital crime had been filed. The police did indicate that they advised Defendant of the nature of the record and asked him at several points whether he wanted to go on and discuss matters further or whether he wanted to stop and talk to his attorney or have his attorney

present. Defendant admits this, acknowledging he told the police his attorney was not necessary at that point and that he would let them know when he wanted one. The record shows the police were careful to determine that Defendant knew his rights and was aware of his situation throughout the interview. We agree with the contention of the State that it might have been more improper for the police to withhold from Defendant the circumstances of the charges against him, and that the police were acting properly in warning Defendant of the ultimate danger of his situation and inquiring of his desire to have a lawyer present. The record clearly shows that Defendant made the second statement because he was aware the police had incriminating evidence against him that could lead to the death penalty and he wanted to portray himself in as good a position as possible with the authorities. It makes it clear then, that his statement was voluntarily and knowingly given. Its admission was consistent with the reasoning in *Mosley* and *Edwards,* to give a suspect an opportunity to make an informed and intelligent assessment of his own interest in deciding that he wants to give a statement to the police. The trial court properly found this statement to be given knowingly and voluntarily.

▉ Defendant further objects to the admission of tapes and transcripts of his statement, apparently on grounds they were not authentic and correct reproductions. Defendant notes that prejudicial matters had been redacted from the transcript, and therefore does not claim that any improper matters were admitted through the tapes or transcriptions. He makes no claim that the tapes failed to meet requirements of clarity. The record shows that the detective present at the the taping of the first interview testified that he had initialed the cassette itself and identified the tape that was being offered as the same tape. He testified it was a true, fair, and accurate reflection of what was said since he had reviewed it with a transcript the same week he testified, and then initialed the transcript as a verification of

its accurate transcription of the tape. He also listened to the tapes of the August 30 conversation, which tapes he had also marked, and those tapes were true and accurate reflections of that conversation. He and the transcriber of the tape also went through the transcripts, comparing them with the contents of the tape and initialing the sheets to insure their accuracy. The State therefore laid the proper foundation for the admission of the tapes as true and accurate reflections of the conversation. At trial, the jurors were given copies of the reviewed transcripts, while the tape recordings were played as evidence. Defendant claims the transcriber made certain changes in the original transcript and the transcripts she typed for trial. The record showed these changes consisted of changing one word here or there, such as the word "the" or "you know". This came about when the witness reviewed the tape and made minor immaterial changes to improve its accuracy. These changes were noted and made known to the jury. The jury also heard the original tape from which the transcript was prepared, and they were therefore able to determine the accuracy or inaccuracy of the transcript. The State laid a detailed foundation for the admission of these exhibits, and Defendant is not able to show any instance in which a material change was made. In fact, the contrary seems quite evident. Defendant therefore has not demonstrated error in the admission of these tapes and transcripts.

## XII

Defendant objected to the manner in which certain handwriting exemplars were put into evidence. The evidence to which he objected regarded handwriting of a person's name on a shopping list found by the victim's husband as compared to handwriting exemplars obtained from the Defendant.

▉ Defendant's first objection in this area goes to the recalling of witness Detective Smith during the foundational evidence

of these exhibits. Detective Smith first testified about the items as he was the one who prepared the exemplars and sent them to the FBI. The State had forgotten to question the police witness about the preparation of these exemplars and their transmission to the FBI. Thus, by the time the FBI handwriting expert testified that the exemplars matched the handwriting of the name and other writing on the shopping list, the exemplars still had not been linked to any individual. The trial court then permitted the State to temporarily excuse the handwriting expert, recall the police witness, Detective Smith, and make that linkage, then conclude the testimony of the expert from the FBI. Although Defendant complains of this procedure, he points out no error resulting from it. He concedes in his argument that the recall of witnesses to correct or add testimony due to mistake or oversight is within the sound discretion of the trial court, citing Scott v. State (1982), Ind., 434 N.E.2d 86, 88; May v. State (1975), 263 Ind. 690, 693, 338 N.E.2d 258, 260; Potter v. State (1971), 257 Ind. 370, 373, 274 N.E.2d 699, 701, reh. denied (1972). Although Defendant generally complains of the procedure, he points out no way in which it was improper or resulted in undue prejudice to him. He does not show that Detective Smith exceeded the permissible scope for his recall or that witness Smith was able to testify to anything further than he would have but for the oversight.

Defendant also complains that the whereabouts of the handwriting exemplar were not testified to between Detective Smith's first appearance on the stand and his recall, during which time the envelope remained open. Hence, he argues, there was a break in the chain of custody during all of this period and expert witness McGinnis should not have been permitted to testify about it without first completing that chain. Defendant makes no specific argument on this issue other than to state it and then incorporate by reference his chain of custody arguments made elsewhere in his brief. It appears, however, that all of these witnesses were able to identify all of these exhibits as being authentic and unaltered and did so in their testimony. We have already discussed in this opinion the nature and character of specific items that are non-fungible and subject to identification by their own appearance. Parks, 270 Ind. at 694, 389 N.E.2d at 290; Pollard, 270 Ind. at 611, 388 N.E.2d at 505; Wilson, 263 Ind. at 481, 333 N.E.2d at 762. These items would fall in that category, and Defendant fails to present a viable issue in this regard.

Defendant also made an objection flowing from the fact that at the FBI laboratories the shopping list exemplar had acquired a discoloration or stain. Witness McGinnis was permitted to testify that these stains appeared to be the result of a chemical treatment used to develop fingerprints that might be on a document. Defendant objected that any such treatment occurred outside of McGinnis' presence, and since he is a handwriting expert rather than a fingerprint expert, he should not have been permitted to testify about it. The State maintains that testimony about the change in color of the paper merely served to explain why the paper was brown rather than the color it was when first discovered, and was relevant to inform the jury that a physical exhibit no longer had its original appearance. The discoloration did not change the general character of the note, as the handwriting was not affected. Defendant does not claim there was any change in the character of the writing or its identification, and does not point out that he was in any way prejudiced by it. Furthermore, the trial court could reasonably have felt that an FBI laboratory expert who routinely examines handwriting samples submitted to the lab would be experienced and familiar with the residue of tests made in other departments of the lab as a matter of routine before being submitted to him, such as fingerprint tests. Thus, admission of McGinnis' testimony on this account was not outside the trial court's broad discretion in the reception of evidence. See Emory, Ind., 420 N.E.2d at 884.

## XIII

In anticipation of a possible line of cross-examination should he take the stand at the guilt phase of the hearing, Defendant filed a motion *in limine*, asking the court to restrict the use of his prior convictions as impeachment to only those crimes permitted by *Ashton v. Anderson* (1972), 258 Ind. 51, 279 N.E.2d 210. He made a similar motion *in limine* concerning the penalty phase of the trial. The trial court took both motions under advisement until such time as Defendant might decide to take the stand, reserving its ruling until the occasion arose, if it arose, to require it. Defendant now claims this affected his strategy in his defense since he had the greater risk of taking the stand without knowing ahead of time what the court would do on these rulings. Defendant did not take the stand in his own defense.

■■■ We see no merit in Defendant's contentions on this issue. He was left in exactly the same position he would have been had the court granted the motions *in limine*. An *in limine* order is merely a temporary order to suspend or prevent the imposition of a subject into evidence without first having the court review the proposed subject outside the presence of the jury. *Davidson v. State* (1982), Ind., 442 N.E.2d 1076, 1078. If the court had granted the motions *in limine* when asked for, it would have delayed a ruling on the subject until the occasion arose for the offering of such evidence. The granting of a motion *in limine* does not conclusively rule that that evidence will not be permitted. *Johnson v. State* (1985), Ind., 472 N.E.2d 892, 908, *reh. denied* (1985). Defendant was left in the same circumstances to make his tactical decision as to his taking the stand as he would have been had the court granted his motions *in limine*. There is therefore no merit to his contention that reversible error is presented on this issue.

## XIV

Defendant claims there was insufficient evidence to sustain the jury's verdict against him. We have already discussed at great length in this opinion the substantial and convincing evidence presented to the jury from many witnesses, including Defendant himself, which overwhelmingly supports the verdict of the jury. We therefore find no merit to this contention.

## XV

Defendant claims several procedural errors were made by the trial court in passing sentence upon him.

■■■ Defendant first complains the trial court had its findings, judgment, and order already prepared in writing at the initiation of the sentencing hearing and then read this prepared statement in open court. Defendant seems to contend that the court did not therefore properly weigh any mitigating circumstances presented at the sentencing hearing, but had prejudged the sentence it was to impose. It is apparent that the trial court, in its judgment and order, considered the trial of the entire case, including the penalty phase, the verdicts of the jury, and a presentence report filed with the court following the trial. The court's findings and judgment detail all of these aspects of the questions before it, and support the reasons it gives for its judgment. Defendant was given an opportunity to present anything he wished at the sentencing hearing, and he makes no showing that there was any issue presented that the trial court failed to consider in its judgment. He points to no actual error or prejudice by reason of the manner in which the court delivered its judgment. The findings, order, and judgment of the trial court properly related the facts and circumstances of these crimes, the background and character of Defendant, and the law as it applied to the circumstances. There is no evidence that the trial court failed to consider any fact or circumstance in any of these areas. On the contrary, the evidence indicates he fully considered them. We therefore see no merit in this contention.

■■■ Defendant further criticizes the trial court's final order in that its findings indicated a consideration of the risk that

Defendant will commit other crimes, the nature and circumstance of the offense, and Defendant's prior criminal record, character, and condition. He claims these are not permitted as aggravating circumstances, and therefore the trial court improperly considered them as such. An examination of the trial court's order shows clearly that the trial court did not denominate these matters as aggravating circumstances. The court did find they were proper considerations for the trial court in passing the sentences as it did. Ind.Code § 35–50–2–9(b) requires an examination of a defendant's prior criminal record or lack thereof as a possibility of statutory mitigating circumstances. The trial court did consider it in this matter. The above statute also requires the trial court to determine the risk that the defendant will commit similar crimes in the future, the nature and circumstance of the offense, and the character and condition of the defendant to determine if the death penalty is a proper penalty in a particular instance. The trial court used the broad mitigating circumstance "any other circumstance appropriate for consideration" in listing these considerations. It was proper for him to do so. *Davis v. State* (1985), Ind., 477 N.E.2d 889, 901, *reh. denied* (1985), U.S. *cert. denied* (1985), —— U.S. ——, 106 S.Ct. 546, 88 L.Ed.2d 475; *Williams v. State* (1982), Ind., 430 N.E.2d 759, 769, *reh. denied* (1982), U.S. *appeal dismissed* (1982), 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47, U.S. *reh. denied* (1982), 459 U.S. 1059, 103 S.Ct. 479, 74 L.Ed.2d 626.

Finally, Defendant claims the trial court did not personally find the necessary aggravating circumstance was proved beyond a reasonable doubt. Again, Defendant is inaccurate in his interpretation of the judge's orders. On more than one occasion in his final judgment the trial judge found that the State of Indiana proved beyond a reasonable doubt the existence of one of the aggravating circumstances, namely, section one of the above mentioned statute, that the defendant committed the murder by intentionally killing Judith Falkenstein

while committing or attempting to commit burglary.

■ Having disposed of all allegations of error raised by Defendant, and finding no error requiring reversal, it is now our responsibility to examine whether the death sentence is appropriate with regard to Defendant Russell Boyd. The trial judge made very detailed findings in support of his imposition of the death penalty pursuant to Ind.Code § 35–50–2–9. The trial judge specifically found: "The State of Indiana proved beyond a reasonable doubt that the defendant Russell Ernest Boyd did murder Judith Falkenstein by intentionally killing her while committing burglary as alleged in the addendum to the charging information and such acts are an aggravating circumstance as set forth in the death sentence statute." This is one of the enumerated aggravating circumstances provided for in Ind.Code § 35–50–2–9(b)(1). The trial court then considered each mitigating circumstance provided for in the above statute. He found Defendant was not under any extreme mental or emotional disturbance, nor was he unable by reason of mental disease, defect, or intoxication, to conform his conduct to the requirements of the law. These findings were substantiated by examinations conducted by a psychiatrist on October 20, 1982, and October 29, 1982, as well as by a neurological evaluation on November 29, 1982, in which all examiners found Defendant was not suffering from, nor was he impaired by, any of those conditions. Defendant was given another psychiatric examination on September 13, 1983, after the verdicts of guilty and the day before the death penalty sentencing hearing. The result of those examinations was a finding by the examiners that Defendant was not under extreme mental or emotional disturbance, nor was there indicated any psychosis or significant mental disease. The court found the victim was neither a participant in, nor did she consent to, Defendant's conduct in committing these crimes. The court further found the Defendant was neither an accomplice of another, nor that he participated in only a relatively minor manner, nor was he un-

der the substantial domination of another person, but rather, found that Defendant acted on his own before, during, and after the time of the murder, and did personally commit the murder purposely and intentionally. The trial court then found that the facts and circumstances failed to show any mitigating circumstances, and that the aggravating circumstance far outweighed any consideration of mitigating circumstances. All of these findings by the trial court were substantially supported by the evidence as we have enumerated in other places in this opinion. It is clear the trial judge complied in all respects with the procedures of Ind.Code § 35–50–2–9, that the death penalty was not arbitrarily or capriciously applied, and that such penalty is reasonable and appropriate considering the nature of the offenses and the character of the offender in this case.

The trial court is in all things affirmed regarding the conviction of Defendant and in the imposition of the death penalty. We accordingly remand this cause to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and DeBRULER, SHEP-ARD and DICKSON, JJ., concur.