Casie McCLASKEY, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 48S00–8803–CR–286.

Supreme Court of Indiana.

June 29, 1989.

Marianne Woolbert, Woolbert & Woolbert, Anderson, for appellant.

Linley E. Pearson, Atty. Gen., Preston W. Black, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant–Appellant Casie McClaskey was convicted following a jury trial in the Madison Circuit Court of the crime of Reckless Homicide, a Class C felony, for which she received a term of five (5) years, and Neglect of a Dependent, a Class B felony, for which she received a term of twenty (20) years. Both sentences were ordered executed and to run concurrently.

McClaskey claims the trial court abused its discretion by suppressing only a portion of several statements she made to the police and also claimed there was insufficient evidence to convict her on either of the charges.

The facts show McClaskey gave statements to the police on four separate occasions but only the first two were admitted into evidence. McClaskey claims these two statements should also have been suppressed.

When reviewing issues regarding the admissibility of a statement and the ensuing waiver of rights in doing so, this Court looks to the totality of the circumstances existing when the statements were taken. *Boyd v. State* (1986), Ind., 494 N.E. 2d 284, 300, *cert. denied* (1987), 479 U.S. 1046, 107 S.Ct. 910, 93 L.Ed.2d 860; *Ball v. State* (1981), 275 Ind. 617, 620, 419 N.E.2d 137, 140. In determining whether the statement was voluntary this Court looks to the surrounding circumstances to determine whether it was induced by violence, threats, promises or other improper influences. When there is conflicting evidence this Court determines whether the probative evidence supports the trial court. *Boyd, supra; Jackson v. State* (1981), Ind., 426 N.E.2d 685, 688.

The facts supporting the charges most favorable to the State show that in July, 1986, McClaskey resided with her husband and two children, Cherrean, aged two, and Russell, nine months of age. McClaskey's husband had been staying at the Anderson Center for about a month receiving treatment for alcoholism. The testimony of witnesses revealed McClaskey's home to be a sweltering, filthy mess. There was evidence of maggots in the refrigerator, dog excrement on the carpet, children's beds soaked with urine, dirty clothes, including soiled diapers, strewn about the house, as well as dirty dishes about the living room and kitchen. The odor of urine permeated the house which was infested with cockroaches and flies.

On Monday, July 14, Kelly Cook, a babysitter, watched the children and described baby Russell's condition as extremely filthy, noting he suffered from severe diaper rash, large sores, and bleeding blisters. Kelly Cook took the baby to her mother, Rebecca Cook, who bathed him and applied ointment to his sores. Mrs. Cook telephoned Anna Lockridge, McClaskey's mother, and threatened to report the situation to the authorities. Mrs. Lockridge told her to wait three days while she attempted to straighten out the situation at McClaskey's home.

Witness Michelle Geist observed McClaskey shake the baby on Tuesday, July 15, as she held him by the waist. The baby continued to cry after McClaskey sat him down. Kelly Cook also testified that, on one occasion, she saw McClaskey shake her baby to keep him quiet.

On Wednesday, July 16, the baby was at Mrs. Lockridge's home during the day. McClaskey took the baby home at 9:30 p.m. He was fussy because he had a fever and suffered from diaper rash. He was also cutting teeth. On Thursday, July 17, the temperature reached 90° and Mrs. Lockridge suggested the baby be taken to her house because it was cooler. McClaskey told her to mind her own business, kept the baby home, and had Kelly Cook baby-sit with him. McClaskey instructed her not to go into the baby's room but Ms. Cook disregarded these instructions and checked on the baby. He was lying still in his crib and when she touched him he opened his eyes and cried out. She gave him a mixture of lemonade and water to replace the spoiled milk in his bottle. After McClaskey learned Ms. Cook went into the baby's room, she told Cook not to go into the room. McClaskey said she didn't need anyone to tell her how to raise her kids and she would do whatever she wanted to with them.

On the evening of July 17, McClaskey had a group of friends over to her house. No one checked on the baby until 11:30 p.m. At that time, the baby's mouth was a dark bluish, purple color, he was hot, and his eyes were glassy. McClaskey took the baby to Mrs. Lockridge who noted his skin was white, his eyes were rolled back, and he was gasping for air.

The baby was then taken to St. John's Medical Center where emergency personnel noted the baby was blue and gasping. He was then transported by helicopter to Methodist Hospital.

Baby Russell was taken to the Pediatric Intensive Care Unit. He was not breathing and was connected to a ventilator. Dr. Stephen Nugent, a specialist in pediatric critical care, noted the baby appeared to be severely dehydrated. In addition, his neurologic examination was profoundly abnormal; for instance, the baby had no reflexes and did not respond to harmful stimuli. The baby's eyes did not move and his pupils were minimally reactive. Dr. Nugent estimated the baby had been dehydrated for eight to twenty-four hours and also noted the baby was one of the dirtiest children he had ever seen.

On July 21, 1986, the child died.

On July 22, 1986, Dr. Dean Hawley, a forensic pathologist, and Assistant Professor of Pathology at the Indiana University Medical Center, performed an autopsy on the baby and determined that he had suffered a variety of injuries. His spinal cord was fractured in mid-back and torn open where the spinal cord enters the base of the skull. Deep bruises were found on his right buttocks, right leg, chest, and head. There were cockroach bites on his right cheek.

Dr. Hawley found the baby's death was the result of multiple blunt force injuries. In addition, Dr. Hawley found the baby's brain and spinal cord injuries were typical of a unique set of injuries characteristic of Shaken Infant Syndrome. This occurs when a child is held under the arms and violently shaken so that the head oscillates back and forth and the spinal cord snaps. Although the brain and spinal cord injuries would have rendered the baby nearly lifeless, he might still have been capable of crying and minimal movement. Dr. Hawley indicated these injuries occurred prior to the baby's hospitalization.

On July 22, 1986, Lieutenant Michael Chambers of the Anderson Police Department began his investigation of the death of baby Russell. Detective Koons, who knew McClaskey's family, contacted McClaskey's mother who told McClaskey that police officers wanted to talk to her. Later the same day, the police officers conducted four interviews with McClaskey.

At 3:15 p.m., McClaskey arrived at the police station and was advised by Chambers that he wanted to question her about the death of her baby. He advised her of her rights and at 3:31 p.m. she signed an acknowledgement and waiver form. Chambers then began the first interview with McClaskey and explained he wanted to review the events prior to the baby's hospitalization. At 4:13 p.m. he stopped the discussion for a break and resumed at 4:55 p.m. with the second interview. Chambers then told McClaskey he wanted to review certain discrepancies between the versions of the events which had been provided by McClaskey and her mother. McClaskey made several incriminating statements during this discussion. She admitted she became extremely angry because baby Russell continued to fuss. She stated she had never been so mad prior to that time.

In the meantime, McClaskey's grandmother requested Attorney Steven Smith to assist McClaskey during the questioning. Mr. Smith went to the police station and demanded to speak with McClaskey. Police officers did not allow him to see McClaskey at that time. Smith saw Deputy Prosecutor David Alger, who was not involved with this case, and asked him to intervene. Alger interrupted the second interview with McClaskey and informed Chambers that Smith wanted to see McClaskey. Chambers terminated the second interview and discussed the situation with Alger. Alger then informed Smith the police would let McClaskey decide if she wanted to see him.

Lieutenant Chambers' third interview with McClaskey was fifteen minutes long. At the end of the interview, Lt. Chambers again asked McClaskey if she wanted an attorney. McClaskey responded she had done nothing wrong and that she would have called an attorney if she wanted one.

Lieutenant Chambers' fourth interview with McClaskey was about thirty minutes long. During the interview, Chambers informed McClaskey her grandmother had called Mr. Smith. He advised McClaskey she could speak with Mr. Smith if she wanted to do so. McClaskey stated she did

not want to talk to Smith. She indicated she was not in a hurry to leave, so Chambers continued the discussion for a short time and then terminated it. McClaskey had not requested the questioning be stopped.

On July 23, 1986, Lieutenant Chambers was contacted by McClaskey who indicated she wanted to speak with him again. Chambers met McClaskey at her grandmother's house and again advised her of her rights. McClaskey provided him with another version of the events which was inconsistent with her earlier version. At trial, McClaskey stated that Lieutenant Chambers' testimony was accurate. She also admitted she became extremely angry when her baby would not stop crying.

McClaskey claims the statements made in her first two interviews should have been suppressed because she was denied access to Attorney Smith.

Although there is conflict in the course of events, all agreed it was McClaskey's grandmother who called Smith to come to the police station. Attorney Smith had apparently consulted with members of the family previously and had entered an appearance for McClaskey in a CHINS (Child in Need of Services) proceeding involving the other child. The trial court determined that the police should have permitted Smith to counsel with McClaskey when Prosecutor Alger appeared and requested they advise her Smith wanted to see her. He therefore suppressed everything after the second interview. It appears the second interview was terminated at the time Alger came into the police station and nothing further was admitted into evidence. We note that even after McClaskey was advised Attorney Smith was there and wished to see her, she stated to the detectives that she did not wish to see him and if she had wanted counsel she would have hired one. Chambers testified that after they came down from the interrogation room, McClaskey told her grandmother she was aware Attorney Smith was there but wished to talk to the police without him anyway. It is also significant that on the next day McClaskey called Officer Chambers and said she wanted to talk to him. He went to her grandmother's house and talked to her without her asking Smith to be there.

In *Moran v. Burbine* (1986), 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410, the United States Supreme Court held that the failure to inform an accused of an attorney's attempts to contact him did not deprive him of his right to counsel or vitiate his waiver of *Miranda* rights. In *Moran*, a member of Moran's family had contacted the Public Defender's Office and asked them to look into Moran's case. The Public Defender called the police and told them not to question Moran without notifying the Public Defender so that he could be present. Police officers informed the Public Defender they would not question Moran until the following day. However, less than an hour later, the police gave Moran his *Miranda* warnings and obtained three signed statements admitting to the murder. In *Moran*, the defendant was unaware of his sister's efforts to retain counsel and of the Public Defender's telephone call to the police. He did not request an attorney. Justice O'Connor, writing for the majority, found the confessions were properly admitted, stating that the waiver is valid as a matter of law once it is determined the suspect's decision not to rely on his rights was uncoerced, that he knew he could request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction. *Id.* at 422–23, 106 S.Ct. at 1142, 89 L.Ed.2d at 422. The court further found that although the withholding of information by police may be ethically objectionable, such conduct is relevant to the waiver only if it deprives the defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them. *Id.* at 423–24, 106 S.Ct. at 1142, 89 L.Ed.2d at 422. In *Michigan v. Jackson*, (1986), 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631, the United States Supreme Court held that statements should be suppressed where Jackson had been charged with the crime, he had been arraigned and demanded an attorney, and his statements were taken when the police knew his attorney was trying to contact him.

■ In the instant case, McClaskey had not been charged and had not hired Attorney Smith for her defense. She at no time requested an attorney and, in fact, told the police she did not want an attorney and expressly said she did not want to talk to Attorney Smith after she was advised he was there. The trial judge here determined that the evidence indicated the police were not expressly aware Attorney Smith was there until the second interview was almost completed. When Deputy Prosecutor Alger discussed the situation with Chambers, Chambers then ended the second interview. The trial court determined all statements made up to that point were admissible. All conflicts in facts, of course, were within the province of the trial court to resolve. Looking at all of the facts and circumstances before the trial court, we cannot say he abused his discretion in making this determination.

■ McClaskey also claims there was insufficient evidence of probative value to support her convictions of reckless homicide in violation of IC 35–42–1–5 and neglect of a dependent in violation of IC 35–46–1–4. In reviewing this issue, we consider only that evidence most favorable to the State together with all reasonable inferences to be drawn therefrom, and if there is sufficient evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Armour v. State* (1985), Ind., 479 N.E.2d 1294, 1297. A person commits reckless homicide if he recklessly kills another human being. A person acts recklessly for purposes of reckless homicide if he engages in conduct in plain, conscious, and unjustifiable disregard of harm that might result and such conduct involves a substantial deviation from acceptable standards of conduct. *Hall v. State* (1986), Ind., 493 N.E.2d 433, 435. There was evidence before the court here that a contributing factor to baby Russell's death was his having been shaken severely. McClaskey's mother testified that the baby was able to respond to stimuli on Wednesday evening, July 16, when McClaskey took the child home with her. McClaskey was alone with the two children, and she admitted she became extremely angry when the baby would not stop crying and that she "may have picked the baby up too hard." The next day the child was found in a state that Dr. Hawley found to be characteristic of the Shaken Infant Syndrome. There was more than adequate evidence justifying the trier of fact to find beyond a reasonable doubt that McClaskey was guilty of reckless homicide.

■ There was a great deal of evidence of probative value that McClaskey's baby was found in a very filthy condition that caused severe diaper rash and sores about its body. There was evidence of bruises on the baby's body, apparently sustained at different times, and witnesses testified to the fact that McClaskey not only neglected the child's personal care but that she failed to seek medical attention when the need was apparent. One time when it was apparent the baby needed medical attention was when his condition deteriorated from the severe shakings he had received. McClaskey attempted to conceal this fact from everyone else and failed to obtain treatment. The doctors testified the baby was extremely dehydrated and had been in that condition for a period of up to twenty-four hours. The jury heard ample evidence of neglect which had occurred over a period of time, justifying a finding of guilty on this charge beyond a reasonable doubt.

The trial court is affirmed.

DeBRULER, GIVAN and DICKSON, JJ., concur.

SHEPARD, C.J., concurs in result with separate opinion.

SHEPARD, Chief Justice, concurring.

I join in affirming McClaskey's conviction for neglect, Ind.Code § 35–46–1–4(a), because she challenges only the sufficiency of the proof supporting each statutory element of the offense. I continue to believe, however, that crimes like the one committed by McClaskey should be treated as homicides and not as matters of neglect. *Lamphier v. State* (1989), Ind., 534 N.E.2d

699 (Shepard, C.J., concurring and dissenting).