COMMONWEALTH *vs.* EMMANUEL MAVREDAKIS.

Hampden. November 1, 1999. - March 7, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, GREANEY, IRELAND, & COWIN, JJ.

*Robbery. Felony-Murder Rule. Evidence,* Admissions and confessions, Consciousness of guilt, Relevancy and materiality. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Self-incrimination, Assistance of counsel, Equal protection of laws. *Practice, Criminal,* Assistance of counsel, Capital case. *Search and Seizure,* Warrant, Probable cause. *Joint Enterprise.*

At the trial of a murder indictment based on a theory of felony-murder with armed robbery as the underlying felony, the Commonwealth produced sufficient evidence of each element of armed robbery to warrant the denial of the defendant's motion for a required finding of not guilty, and the armed robbery did not merge with the murder offense. [854-855]

Discussion of Massachusetts and other cases decided before and after *Moran v. Burbine,* 475 U.S. 412 (1986), relative to the validity of a criminal suspect's waiver of Miranda rights if he is not informed by police that an attorney is attempting to render assistance. [855-858]

This court concluded that art. 12 of the Massachusetts Declaration of Rights requires police officers to inform a suspect of an attorney's effort to contact the suspect for the purpose of providing legal advice, and that the suspect's knowledge of that effort is necessary to effect a knowing and intelligent waiver of Miranda rights. [858-860, 861]

Where police policy improperly forbade suspects under interrogation from being contacted by third parties, including attorneys, either over the telephone or in person, statements made by a suspect after his attorney contacted the police and attempted to assist his client should have been suppressed: a new trial was required. [861-862]

Where a search warrant application was based, in part, on statements of the defendant to police that should have been suppressed, the judge, on retrial, should reexamine the issue whether there was probable cause for the issuance of the warrant. [862]

At the trial of a criminal case, the judge properly allowed in evidence, with appropriate limiting instructions, a comment of the defendant related to his gang involvement that demonstrated consciousness of guilt [862-863]; and, likewise, statements of the defendant in furtherance of the criminal joint venture [862-864].

INDICTMENTS found and returned in the Superior Court Department on August 25, 1995.

A pretrial motion to suppress evidence was heard by *Francis X. Spina,* J., and the cases were tried before *Mary-Lou Rup,* J.

*Donald A. Harwood* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney (*Lori K. Odierna,* Assistant District Attorney, with him) for the Commonwealth.

IRELAND, J. The defendant was convicted of murder in the first degree on the theory of felony-murder.[1] He also was convicted of armed robbery, the underlying felony; breaking and entering in the nighttime; and illegal possession of a firearm. On appeal, he challenges the denial of his motion for a required finding of not guilty on the armed robbery and felony-murder charges; the denial of his motion to suppress statements he made to the police in response to questioning at the police station (and items subsequently seized pursuant to a warrant that was issued, in part, based on information he had disclosed in his statements); and certain evidentiary rulings. He seeks a new trial or a reduction in the degree of the verdict pursuant to G. L. c. 278, § 33E. Because we conclude that art. 12 of the Massachusetts Declaration of Rights requires the police to inform a suspect of an attorney's efforts to contact him for purposes of providing legal advice, the majority of the defendant's statements to the police should have been suppressed and, accordingly, the defendant is entitled to a new trial.

1. *The murder.* We summarize the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Nichypor,* 419 Mass. 209, 210 (1994). Edward Baladinakis (Eddie) was working the night shift on August 11, 1995, at the Kentucky Fried Chicken Restaurant (KFC) in West Springfield. At approximately midnight, Eddie's brother, Emmanuel Baladinakis (John), and their two friends, Carlo Siniscalchi and the defendant, arrived at the KFC to pick Eddie up after work. Approximately twenty minutes later, the foursome drove to the Baladinakis home. They discussed breaking into the KFC. Eddie claimed fatigue and declined to join the venture.

John and the defendant went inside the house and spoke with John's girl friend, Catherine Zayas. John told Zayas that he, the

---

[1]The Commonwealth proceeded at trial on all three theories of murder in the first degree.

defendant, and Siniscalchi were going to get a gun[2] and break into the KFC. John, Siniscalchi, and the defendant left shortly thereafter, with Siniscalchi driving.

They arrived at the KFC at approximately 1 A.M., but saw that the lights were still on. Rather than entering while someone was there, they went to a grocery store and bought a few items sometime before 1:31 A.M. Returning to the KFC and seeing that nobody was there, John and the defendant, using John's keys,[3] unlocked a door to the KFC, while Siniscalchi remained in the car.

When they entered, they found the safe open. Fearing that the night manager might return, the defendant suggested that they leave immediately. John insisted that he wanted to get all of the money from the safe.

Thomas Henson, the shift supervisor on duty that night, returned to the KFC after making a night deposit. John and the defendant ran to the back of the restaurant and hid. Henson walked to the office and turned on the light. Then, he walked to the kitchen where he was shot three times. Despite being shot, Henson moved toward the front of the restaurant and collapsed. After he fell to the floor, he was shot twice more.

The defendant and John took approximately $1,000 in bills and rolled coins from three cash register drawers that were in the safe. They also took receipts, a police scanner, and a white towel. They wiped off the surfaces that they had touched and placed the drawers in water-filled sinks, in an attempt to remove their fingerprints. Siniscalchi was not outside waiting, so they walked toward a pizza shop to call him. As they walked, John carried the money in a white plastic grocery bag. On the way, they passed by Agri-Mark, a dairy processing plant. An employee on his break saw them walking by and noticed that one of them was carrying a white plastic bag. Several rolls of coins were discovered where the two of them had been walking.

Shortly thereafter, Siniscalchi picked up the defendant and John and they drove to the defendant's house. The defendant hid some items in his cellar. Siniscalchi and John then went to John's home. There, Siniscalchi and John told Eddie and Zayas what had happened. They told Zayas that, if the police should

---

[2] They were using a gun that Eddie had purchased approximately one month earlier.

[3] John had previously worked at the West Springfield Kentucky Fried Chicken (KFC) and still had a set of keys.

question her, she should say that the defendant, John, and Siniscalchi went to "Worthington Street with some girls" after they picked Eddie up from work at the KFC. They were also instructed to tell the police that Eddie had left his gun at the KFC and was planning to get it in the morning when he went to work.

2. *The investigation and the defendant's statements to the police.*[4] Henson's body was discovered at approximately 8:40 A.M. on August 12, 1995. On arriving at work, Eddie told police that he had left his gun in the men's restroom, and that he had been with the defendant, John, and Siniscalchi the night before. The police sought to locate each of these individuals in an attempt to confirm Eddie's statement.

At approximately 8:40 P.M.,[5] two police officers arrived at the family-owned restaurant where the defendant worked. They identified themselves to the defendant and asked him to accompany them to the police station. The defendant asked if it was about the murder at the KFC. When one of the officers asked the defendant why he had asked that question, the defendant said that his father had told him something about it. The motion judge found that the defendant went voluntarily with the officers to the police station, and that the defendant was not a suspect at that time. As he was leaving, the defendant asked a waitress to telephone his father so that his father could close down the restaurant for the night.

On arriving at the station, the defendant was taken to the "drug room," a large office with a word processor. At 8:55 P.M., the defendant was given Miranda warnings and signed a "Miranda rights/waiver" form. At 9:07 P.M., the defendant began dictating a noninculpatory statement to an officer who typed the statement into the computer. The interview lasted approximately twenty minutes; because there was some trouble with the computer printer, the defendant did not sign the statement until 9:40 P.M.

Meanwhile, the defendant's father arrived at the station at approximately 9:30 P.M. and asked to speak to the defendant. When his request was denied, the defendant's father left the sta-

---

[4]"In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990).

[5]Officers had tried to interview the defendant earlier in the day, but had not been able to find him.

tion. The defendant was not informed that his father was at the station.

At 9:45 P.M., Eddie gave the police a statement implicating John, Siniscalchi, and the defendant in the shooting. The motion judge found that at that time, 9:45 P.M., the defendant became a suspect and was no longer free to leave.

Just before 10 P.M., Sergeant Paul Finnie told the defendant that he knew he was lying, and told him that there was a witness who could place him at the scene of the crime. In response, the defendant stated that he knew the person at Agri-Mark would be their undoing, that he had been at the KFC, but that, if he said anything, "he'd be dead." The motion judge found that shortly thereafter two more officers, Lieutenant Peter Higgins and Captain Daniel Murray, entered the room. They overheard the defendant say that, if he talked, the Los Solidos gang, to which he belonged, would kill him or his parents. Lieutenant Higgins and Captain Murray then left the room.

Meanwhile, the defendant's relatives had retained Attorney Steven Leary to represent the defendant. At 10:15 P.M., Attorney Leary called the police station and informed Sergeant Ferrarini that he had been retained by the defendant's family to represent the defendant, and asked to speak with the defendant. Sergeant Ferrarini denied Attorney Leary's request because, after conferring with Lieutenant Higgins, he determined that the defendant had not requested to speak with a lawyer. Although Attorney Leary demanded that the defendant not be questioned further until he arrived at the station,[6] the police continued their interrogation. The police did not inform the defendant of Attorney Leary's call.

The defendant's father had also contacted a second lawyer, Steven Newman. Because Attorney Newman was closer to the police station than Attorney Leary, it was agreed that Attorney

---

[6]At this point in the conversation, Sergeant Ferrarini told Attorney Leary that he did not know him, and did not even know whether he was an attorney. When Attorney Leary asked to speak with officers that he did know, and who could identify him, Sergeant Ferrarini, on the advice of Lieutenant Higgins, told Attorney Leary that he would have to come down to the station to identify himself. Even though Lieutenant Higgins knew Attorney Leary, he did not offer to verify his identity because, in the words of the motion judge, Lieutenant Higgins "knew that if Attorney Leary spoke to the defendant the interrogation would end."

Newman would go to the station.[7] Attorney Newman and the defendant's father arrived at the station at 10:30 P.M. and asked to see the defendant. The defendant, however, was not told that his father and Attorney Newman were there until 11:05 P.M.[8]

At approximately 10:40 P.M., while Attorney Newman was waiting downstairs, the defendant, who up to that point had denied involvement in the shooting, admitted his involvement. In response to questions about who had shot the victim, the defendant stated, "We didn't mean to shoot [the victim]," and was placed under arrest.[9]

At approximately 11:05 P.M., the defendant was informed that his father and Attorney Newman were in the station, and he was asked whether he wished to speak to them. The defendant, who by then was in the process of writing out a confession by hand, said that he wanted to finish writing his statement before speaking to them. After finishing his statement at 11:30 P.M., the defendant gave the police additional information which was incorporated into a search warrant application. Based in part on the defendant's statements, the police obtained a warrant to search the cellar of the duplex where the defendant lived. Executing the warrant, they found the murder weapon, stolen money, various bullets, KFC paperwork, a white towel, the police scanner, John's keys to the KFC, and some of the clothes that the defendant and John had been wearing the night of the crime.

The motion judge found that "[the] West Springfield Police Department has a policy of neither putting any third person through to someone being interviewed by police at the station nor informing any such interviewee that a third person wants to

[7]Attorney Leary had no further contact with this case.

[8]The motion judge found that "the failure of police to determine . . . that Attorney Newman was there to see the defendant [was] non-deliberate and non-purposeful; though I am convinced that they would not have let him see the defendant unless the defendant had previously requested to speak to an attorney, which he did not." While this finding seems to conflict with the judge's finding regarding Lieutenant Higgins's actions, see note 6, *supra*, we see no need to address the issue because, as we discuss *infra*, the policy of the West Springfield police department was unconstitutional.

[9]There was conflicting testimony among the police officers about when the defendant actually made this statement. Captain Murray stated that he remembered this remark being made at 10:05 P.M., because he made a notation on a pizza box that was later thrown away. The motion judge apparently chose instead to rely upon testimony of other officers and the times listed in the official police report written the night of the interrogation.

speak to such interviewee, regardless of whether the third person is at the station or on the phone, unless the person being interviewed has previously requested the contact."

Following the analysis that the Supreme Court formulated in *Moran* v. *Burbine*, 475 U.S. 412 (1986) (*Moran*), the motion judge denied the defendant's motion to suppress. We "independently review[] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Nieves*, 429 Mass. 763, 768-769 n.5 (1999), quoting *Commonwealth* v. *Magee*, 423 Mass. 381, 384 (1996).

3. *Motion for a required finding of not guilty.* The defendant claims that there was no evidence warranting a finding that the victim was shot in the course of an armed robbery, the underlying felony for the charge of murder in the first degree, only that the victim was shot in the course of a breaking and entering. In reviewing the ruling on the motion for a required finding of not guilty, we consider whether the evidence, viewed in the light most favorable to the Commonwealth, was sufficient to permit a jury to infer beyond a reasonable doubt the essential elements of the crime charged.[10] See *Commonwealth* v. *Walsh*, 407 Mass. 740, 741 (1990), citing *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-678 (1979). We conclude that the Commonwealth produced sufficient evidence of each element of armed robbery.

The defendant argues that the evidence, viewed most favorably to the Commonwealth, demonstrated at most that the defendant and his joint venturers intended to steal money and food from the restaurant, that they intended to do so after the victim had left the premises for the night, that the victim unexpectedly returned while the breaking and entering was in progress, and that the moment the victim put on the light he was shot in the course of this breaking and entering.

In *Commonwealth* v. *Rajotte*, 23 Mass. App. Ct. 93 (1986), a case factually similar to the case at bar, a restaurant employee interrupted the defendant's theft while it was in progress. The defendant was convicted of armed robbery and argued on appeal that "the taking was not effected by force or threat of force and hence was only a larceny and not a robbery. The intimidation occurred, he claim[ed], only after he was caught by the

---

[10]The question is not, as the Commonwealth argues, whether the defendant had a "conditional" or "contingent" intent to commit an armed robbery, if necessary. Rather, the true question is whether the Commonwealth's case contained enough evidence to prove every element of armed robbery.

employee." *Id.* at 94. The Appeals Court rejected that claim, holding that the larceny was converted into a robbery because the assault was committed on someone who had a "protective concern" for the goods taken (as did the victim in this case) and who had interfered with the completion of the theft (as did the victim in this case). *Id.* at 94-96. See *Commonwealth* v. *Assad,* 19 Mass. App. Ct. 1007 (1985) (involving tenant who returned to his apartment, interrupting would-be thieves).

Here, the defendant and John were still inside the restaurant and the theft was still in progress when the victim arrived. In effect, what began as a breaking and entering and a larceny was converted into an armed robbery once the victim arrived on the scene. See *Commonwealth* v. *Johnson,* 379 Mass. 177, 181 (1979) ("Robbery includes all the elements of larceny and in addition requires that force and violence be used against the victim or that the victim be put in fear").[11]

The underlying felony, armed robbery, was not a crime that merged with the murder. As we stated in *Commonwealth* v. *Christian, ante* 552, 556 (2000), in regard to the felony-murder merger doctrine, "[w]e can envision no situation in which an armed robbery would not support a conviction of felony-murder." As we went on to explain there, "a defendant who commits a robbery in a manner that intentionally heightens the possibility of the victim's death, by shooting the victim first, cannot escape application of the felony-murder rule." *Id.* at 557.

4. *The art. 12 duty to inform a suspect under police interrogation of an attorney's efforts to provide counsel.* The defendant argues that the statements he gave to the police after the attorneys attempted to contact him should have been suppressed because he had a constitutional right to be informed of their efforts to provide legal assistance.[12]

In a series of decisions handed down before the United States Supreme Court had spoken on the issue, we concluded that a

---

[11]Contrast *Commonwealth* v. *Novicki,* 324 Mass. 461, 465 (1949) (finding no justification for an armed robbery conviction where alleged robber had taken money, left the victim's presence undetected, and was in the process of leaving through a door when the victim first noticed him; "[a]lthough the crime may be considered as continuing at least until the defendants left the store with the money . . . it cannot be said that the fright which [the victim] experienced when she saw [one defendant] leaving the [cashier's] cage with the money was a factor in the taking of the money from her possession").

[12]The defendant, who was seventeen years old at the time of the shooting and the interrogation, also cursorily raises the denial of access to his father as a basis for the suppression of his statements to the police. Because the

suspect's knowledge of an attorney's efforts to render assistance was necessary to effect a knowing and intelligent waiver of a suspect's Miranda rights, and that if a suspect were not so informed, any waiver obtained from the defendant was inoperative. See *Commonwealth* v. *Sherman*, 389 Mass. 287, 288 (1983); *Commonwealth* v. *Mahnke*, 368 Mass. 662, 691-692 (1975), cert. denied, 425 U.S. 959 (1976); *Commonwealth* v. *McKenna*, 355 Mass. 313, 317-320 (1969). Those decisions did not state, however, whether they were based on the Federal or the State Constitution.

Then, in *Moran*, *supra*, the United States Supreme Court ruled that, under the Fifth and Sixth Amendments to the Federal Constitution, the police had no duty to inform a suspect of an attorney's efforts to render legal services when the suspect had not personally requested such legal representation. The majority opinion reasoned that a defendant's Fifth Amendment rights were not implicated because "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely . . . have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. Further, the Court ruled that a defendant's Sixth Amendment rights were not infringed because the right to counsel attaches only after the filing of criminal charges. *Id.* at 432. The motion judge correctly concluded, as the defendant effectively concedes on appeal, that *Moran*, *supra*, is dispositive on the Federal constitutional issue.

In the wake of the Court's decision in *Moran*, *supra*, a number of other jurisdictions have analyzed, under their respective State Constitutions, the same question we confront today. Many States have determined that State constitutional law mandates broader protection from self-incrimination than the *Moran* decision affords.[13] Other jurisdictions have deter-

---

defendant was no longer a juvenile, he was not entitled to the protections afforded juveniles detailed in *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134-135 (1983). See *Commonwealth* v. *Carey*, 407 Mass. 528, 536-538 (1990).

The defendant also argues that *all* his statements to the police were involuntary, based on the fact that he had only recently reached the age of majority. However, the motion judge made numerous findings concerning factors such as the defendant's physical and mental state, maturity, the physical surroundings, and the tenor of the questioning. None of these findings was clearly erroneous, and they more than adequately supported the judge's conclusion that the statements made before 10:15 P.M. were voluntary.

[13]See *People* v. *Houston*, 42 Cal. 3d 595, 609-610 (1986) (analyzing issue

mined that, on this issue, their State Constitutions do not provide rights beyond those required by the Federal Constitution and adopt the analysis of *Moran*.[14]

Since the *Moran* decision, we have not had the opportunity to rule on the State constitutional issue. See *Commonwealth* v. *Cryer*, 426 Mass. 562 (1998). Two Appeals Court decisions, however, have assumed that *Commonwealth* v. *McKenna, supra*; *Commonwealth* v. *Mahnke, supra*; and *Commonwealth* v.

---

under California Constitution and finding reasoning of *Moran* "unpersua-[sive]") (superseded by constitutional amendment); *State* v. *Stoddard*, 206 Conn. 157, 166 (1988) (tracing history of due process clause of Connecticut Constitution, as well as right to counsel, and concluding police must inform suspect of attorney's telephone call); *Bryan* v. *State*, 571 A.2d 170, 176-177 (Del. 1990) (interpreting Delaware Constitution); *Haliburton* v. *State*, 514 So. 2d 1088, 1090 (Fla. 1987), cert. denied, 501 U.S. 1259 (1991) (failure to notify suspect of attorney's presence at police station violates due process clause of Florida Constitution); *People* v. *McCauley*, 163 Ill. 2d 414, 424-446 (1994) (relying on previous State decisions and Illinois Constitution to suppress statements after attorney denied access to defendant at police station); *West* v. *Commonwealth*, 887 S.W.2d 338, 342 (Ky. 1994) (holding Kentucky Constitution provides greater protection of individual rights than Federal Constitution, and criminal rule providing access to counsel predating *Moran* survives); *People* v. *Bender*, 452 Mich. 594, 612-614 (1996) (Michigan Constitution requires informing suspect of counsel's attempts to provide assistance; without such information waiver of rights not knowing and voluntary); *State* v. *Reed*, 133 N.J. 237, 262 (1993) (common-law and statutory right against self-incrimination requires informing suspect of attorney's efforts to provide assistance, and lack of such information renders suspect's waiver of rights "invalid per se"); *State* v. *Simonsen*, 319 Or. 510, 514 (1994) (constitutionally requiring that police inform defendant of counsel's attempts to consult with him, and suppressing evidence obtained from the defendant's confession because waiver of right to counsel not knowing, intelligent, and voluntary).

[14]See *Mitchell* v. *State*, 306 Ark. 464, 468-469 (1991) (adopting reasoning of *Moran* without separate analysis under State Constitution); *McClaskey* v. *State*, 540 N.E.2d 41, 44 (Ind. 1989) (same); *Lodowski* v. *State*, 307 Md. 233, 244-247 (1986) (following precedent that had interpreted art. 22 of the Maryland Declaration of Rights to be in pari materia with the Federal Constitution); *State* v. *Drayton*, 293 S.C. 417, 426-427 (1987), cert. denied, 484 U.S. 1079 (1988) (adopting reasoning of *Moran* without a separate analysis under State Constitution); *State* v. *Stephenson*, 878 S.W.2d 530, 546-547 (Tenn. 1994) (art. I, § 9, of Tennessee Constitution in accord with *Moran*); *State* v. *Earls*, 116 Wash. 2d 364, 377 (1991) (majority opinion relying on precedent that had interpreted art. 1, § 9, of the Washington Constitution "as being identical in scope to the Fifth Amendment"); *State* v. *Hanson*, 136 Wis. 2d 195, 211-212 (1987) (majority opinion interpreting Wisconsin Constitution, art. I, § 8, in accord with *Moran* because wording "virtually identical" to Fifth Amendment).

*Sherman*, *supra*, survived *Moran* and were still good law. See *Commonwealth* v. *Menconi*, 28 Mass. App. Ct. 504, 506 (1990); *Commonwealth* v. *DiMuro*, 28 Mass. App. Ct. 223, 226-227 n.2 (1990). The assumption of the Appeals Court was correct.

We have noted that we "can interpret the rights of our citizens under art. 12 to be more expansive than those guaranteed by the Federal Constitution." *Commonwealth* v. *Cryer*, *supra* at 568. As we stated in *Commonwealth* v. *Hodge*, 386 Mass. 165, 169 (1982), in discussing the differences between the Sixth Amendment and the Massachusetts Declaration of Rights, the "Declaration of Rights can . . . provide greater safeguards than the Bill of Rights of the United States Constitution."

In deciding whether to interpret art. 12 more expansively than the Fifth Amendment, we look to the text, history, and our prior interpretations of art. 12, as well as the jurisprudence existing in the Commonwealth before *Moran* was decided. Throughout our analysis, our guiding consideration is whether the Federal rule adequately protects the rights of the citizens of Massachusetts in regard to self-incrimination and the affirmative right to access legal counsel during police interrogations. See Wilkins, Judicial Treatment of the Massachusetts Declaration of Rights in Relation to the Cognate Provisions of the United States Constitution, 14 Suffolk U.L. Rev. 887, 921 (1980) ("standards under a state constitution that are more strict than the 'lowest common denominator' determined under the United States Constitution may be appropriate in the special circumstances of a given state or by a different measure of what essential fairness requires").

The text of art. 12, as it relates to self-incrimination, is broader than the Fifth Amendment. The Fifth Amendment, in relevant part, states: "[N]or shall [any person] be compelled in any criminal case to be a witness against himself." Article 12, however, commands that "No subject shall . . . be compelled to accuse, or furnish evidence against himself." Based on the textual differences between art. 12 and the Fifth Amendment, we have "consistently held that art. 12 requires a broader interpretation [of the right against self-incrimination] than that of the Fifth Amendment." *Opinion of the Justices*, 412 Mass. 1201, 1210 (1992), quoting *Attorney Gen.* v. *Colleton*, 387 Mass. 790, 796 (1982) (admitting evidence of defendant's refusal to consent to breathalyzer test at criminal trial would

violate art. 12). The precise wording of art. 12 was a subject of debate at the Constitutional Convention of 1779-1780. Journal of the Convention for Framing a Constitution of Government for the State of Massachusetts Bay 38-39, 151 (1832). It is a standard principle of constitutional interpretation that "[a]ll [the] words [of the Constitution] must be presumed to have been chosen advisedly." *Mount Washington v. Cook*, 288 Mass. 67, 70 (1934).

The history of art. 12, and our prior interpretations of its self-incrimination provisions, also lead to the conclusion that art. 12 provides greater protection than the Federal Constitution does. As we have previously pointed out, the "Constitution of the Commonwealth preceded and is independent of the Constitution of the United States. In fact, portions of the Constitution of the United States are based on provisions in the Constitution of the Commonwealth." *Commonwealth v. Upton*, 394 Mass. 363, 372 (1985). Article 12 and other similar State constitutional provisions evolved from a sense of disapproval of the inquisitorial methods of the Star Chamber and ecclesiastical courts in England. See Note, The Colonial and Constitutional History of the Privilege Against Self-incrimination in America, 21 Va. L. Rev. 763, 770, 788-789 (1935). Our precedents have often interpreted art. 12 expansively. See, e.g., *Emery's Case*, 107 Mass. 172, 181 (1871) (art. 12 "forbids that [a person] should be compelled to accuse himself. By the narrowest construction, this prohibition extends to all investigations of an inquisitorial nature, instituted for the purpose of discovering crime, or the perpetrators of crime, by putting suspected parties upon their examination in respect thereto, in any manner . . . . But it is not even thus limited").

Accordingly, art. 12 requires a higher standard of protection than that provided by *Moran*. The *Moran* analysis proceeds from the assumption that information regarding the immediate availability of an attorney has no bearing on a suspect's ability knowingly and intelligently to waive Miranda rights. As other courts have mentioned, however, there is an important difference between the abstract right to speak with an attorney mentioned in the Miranda warnings, and a concrete opportunity to meet "with an identified attorney actually able to provide at least initial assistance and advice." *State v. Haynes*, 288 Or. 59, 72 (1979), cert. denied, 446 U.S. 945 (1980). "Faced with a concrete offer of assistance . . . a suspect may well decide to

reclaim his or her continuing right to legal assistance." *State* v. *Stoddard*, 206 Conn. 157, 167-168 (1988). Essentially, the duty to inform a suspect of an attorney's efforts to render assistance is necessary to actualize the abstract rights listed in *Miranda* v. *Arizona*, 384 U.S. 436 (1966). Accordingly, the duty to inform is only another way of saying that the rights listed in the *Miranda* case are substantively meaningful. Cf. *Commonwealth* v. *McKenna, supra* at 324 ("the opportunity to exercise [Miranda] rights throughout the interrogation" is as important as being informed of those rights).

Any other approach would lend tacit approval to affirmative police interference with the attorney-client relationship. We prefer to view the "role of the lawyer . . . as an aid to the understanding and protection of constitutional rights," rather than "as a nettlesome obstacle to the pursuit of wrongdoers." *Moran, supra* at 433 (Stevens, J., dissenting). In the words of one of our sister jurisdictions, "[t]he day is long past . . . where attorneys must shout legal advice to their clients, held in custody, through the jailhouse door." *People* v. *McCauley*, 163 Ill. 2d 414, 423 (1994).

In addition, we address several arguments that have been raised against the creation of a duty to inform a suspect of an attorney's efforts to render assistance. First, we address the concern that such a rule is unfair as it would only benefit those who already had legal representation at the time of a police interrogation. As the Supreme Court of California stated: "We fail to see . . . how an individual enmeshed in custodial inter-rogation can be kept from his own lawyer . . . simply because other suspects under questioning do not yet have attorneys. The doctrine of equal protection is society's shield against discriminatory treatment by the authorities. It is not a sword with which the authorities may deprive the accused of his counsel's assistance." *People* v. *Houston*, 42 Cal. 3d 595, 612 (1986) (superseded by constitutional amendment).

Second, the Commonwealth argues that such a duty would create administrative difficulties. However, the duty to inform is a bright-line rule. Furthermore, until the decision in *Moran*, it was clear that such a duty to inform did exist in the Com-monwealth, and that the duty was regularly observed. The same is true for other jurisdictions that have adopted a duty to inform. See note 13, *infra.* Our conclusion does not, however, mean that the police have a duty to provide information such as the

"nature and quality of the evidence" that the investigation has amassed against the suspect. *Oregon* v. *Elstad,* 470 U.S. 298, 317 (1985). Rather, the duty we announce concerns solely the obligation "to apprise the defendant of a specific communication from his attorney that bore directly on the right to counsel." *State* v. *Stoddard, supra* at 169.

The establishment of a duty to inform a suspect of an attorney's efforts to provide legal advice builds on our decisions in *Commonwealth* v. *Sherman,* 389 Mass. 287 (1983); *Commonwealth* v. *Mahnke,* 368 Mass. 662 (1975); and *Commonwealth* v. *McKenna,* 355 Mass. 313 (1969). When an attorney identifies himself or herself to the police as counsel acting on a suspect's behalf, the police have a duty to stop questioning and to inform the suspect of the attorney's request immediately. The duty to inform applies whether the attorney telephones or arrives at the station.[15] See *State* v. *Stoddard, supra* at 171 (telephone call from attorney triggers duty to inform). The suspect can then choose whether to speak with the attorney, or to decline the offer of assistance. On the suspect's acceptance of this assistance, the police must suspend questioning until the suspect is afforded the opportunity to consult with the attorney either on the telephone or in person. If the attorney telephones and then informs the police that he or she will appear for the initial consultation, the suspension of questioning will apply only so long as the attorney appears at the station within a reasonable time.

The Commonwealth has the burden of proving that the suspect declined the offer of legal advice. The consequence of the failure so to inform a suspect is that any waiver of rights that has been given becomes "inoperative" for further admissions. *Commonwealth* v. *McKenna, supra* at 324. "Only that part of the interrogation is admissible which the prosecution proves to have taken place before" the failure to inform occurred. *Id.* at 325.

In this case, the motion judge found that the West Springfield police department had a policy that forbade suspects under interrogation from being contacted by third parties either over the telephone or in person. The policy also forbade informing the suspect of these attempted communications. This policy of

---

[15]Police departments may want to institute policies for identifying and verifying that individuals representing themselves as attorneys are in fact attorneys, whether on the telephone or in person.

the West Springfield police department is unconstitutional insofar as it applies to attorneys' contacts with suspects. Those statements made before 10:15 P.M., the time that Attorney Leary telephoned the police station, were properly admitted. All the defendant's statements made after 10:15 P.M. should have been suppressed. We now address several additional issues raised by the defendant in order to provide guidance on retrial.

5. *Search warrant.* The search warrant, which eventually led to the discovery of a cache of evidence, including the murder weapon, stolen money, and KFC paperwork, was issued in reliance, at least in part, on the defendant's statements to the police. At retrial, the judge should determine whether, excluding the defendant's statements made after 10:15 P.M. and any other evidence tainted by those statements, there was probable cause for the warrant to issue. See *Wong Sun* v. *United States*, 371 U.S. 471, 488 (1963); *Commonwealth* v. *Wilson*, 427 Mass. 336, 342 (1998).

6. *Evidentiary rulings.* a. Before Attorney Leary telephoned the police station, the defendant told the police that he was a member of the Los Solidos gang and that, if he said anything, he or his parents would be killed. The defendant moved in limine to exclude this remark, claiming that the gang reference would be unduly prejudicial. The motion was allowed without prejudice. At trial, however, the judge allowed the Commonwealth, over the defendant's objection, to introduce the statement. The Commonwealth also introduced evidence that the defendant, subsequent to making that statement, had twice denied that he was a member of any gang. The Commonwealth offered the evidence on the theory that the defendant's conflicting statements, particularly his false claim initially that he could not speak to the police because of his gang involvement, demonstrated consciousness of guilt.

The judge was within her discretion in determining that the defendant's comment about his involvement in a gang was relevant to consciousness of guilt and that the probative value of the evidence outweighed the prejudice to the defendant. See *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981) (balancing probative and prejudicial value of evidence an issue on which the opinion of trial judge will be accepted except for palpable error). In any case, the potential for prejudice was limited because the judge carefully instructed the jury, both at the time

the evidence was admitted and again in her final charge, that the evidence was admitted only for this limited purpose.[16]

b. Also over objection, the Commonwealth was permitted to introduce several statements made by John and Siniscalchi to the police and to Zayas.[17] The defendant claims that there was no evidence to warrant a finding that he was involved with the others in an ongoing joint venture after the shooting, when some of the statements were made. Statements made after a crime has been committed, but at a time when the joint venturers are "attempting actively to conceal evidence," "to avoid detection and detention," or "to enlist [another's] aid in their concealment and escape," and which are made while the joint venturers' interests are still "closely bound together, tending to ensure the reliability of their statements," are admissible against all joint venturers. *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533, 545 (1990). See *Commonwealth* v. *Simpson,* 370 Mass. 119, 122 (1976). The statements were admissible because there was ample evidence for the jury to find that the defendant, John, and Siniscalchi were engaged in an ongoing attempt to

---

[16]The defendant also claims that the judge's ruling on this matter was problematic because she had tentatively ruled before trial that this evidence would be excluded, and that, therefore, she did not ask the prospective jurors a voir dire question requested by the defendant concerning their attitudes about gangs. However, the judge made clear that her preliminary ruling on the matter was tentative only and might be reconsidered at trial as the evidence unfolded. The defendant expressly withdrew his request for the voir dire question that he now complains should have been asked.

[17]A police officer testified that, during questioning, John and Siniscalchi initially stated that they, along with the defendant, picked up Eddie after work at approximately midnight on the night of the shooting, and that they all either went to a bar or went home for the night. The officer testified that neither John nor Siniscalchi mentioned returning to West Springfield that night. There was evidence that John, Siniscalchi, and the defendant were in a supermarket in West Springfield, near the scene of the shooting, at approximately 1:30 A.M., shortly before the victim was shot and killed. It was inferable that the statements by John and Siniscalchi, in which they omitted telling of their presence in the area, were intended to cover up their involvement.

Zayas testified that, shortly after the time of the shooting, she was present in Eddie's house with John and Siniscalchi, and that they told her that, if asked, she should tell the police that they were in Springfield after they picked up Eddie from work; that they went home from there; and that Eddie had left his handgun at the restaurant that night and intended to pick it up in the morning. As John and Siniscalchi were instructing her on what to say, Eddie was speaking in Greek to someone on the telephone. An inference could be drawn that he was talking to the defendant.

cover up the crime at the time the challenged statements were made, and that the challenged statements were made in furtherance of their ongoing efforts. In addition, the judge instructed the jury as to the use of such evidence both during the officer's testimony and again during the final charge.

7. *General Laws c. 278, § 33E*. Because we conclude that art. 12 requires the police to inform a suspect of an attorney's efforts to contact him for purposes of providing legal advice, certain statements that the defendant made to the police, listed in Part 4, *supra*, should have been suppressed. We cannot conclude that the admission of these statements was harmless, and the defendant is therefore entitled to a new trial.

Accordingly, the judgments are reversed, the verdicts set aside, and the cases remanded to the Superior Court for a new trial.

*So ordered.*