Sweeney, J.
The defendant Jermaine Hunter was indicted for the murder of Jeffrey Daniels. (G.L.c. 265, §1.) He was also charged with unlawful possession of a firearm (G.L.c. 269, §§10(a), 10G(a)), armed robbery (G.L.c. 265, § 17) and two counts of assault and battery by means of a dangerous weapon (G.L.c. 265, §15A(b)). The defendant moves to suppress statements he made to police on June 8, 2000 and derivative evidence acquired through the information contained within those statements. For the reasons set forth herein, the defendant’s motion is allowed.

BACKGROUND

On June 7, 2000, Jeffrey Daniels was shot to death in Chicopee, Massachusetts. The Commonwealth alleges that the defendant killed him during the course of an armed robbery. By the early morning hours of June 8, 2000, the police had obtained a warrant for the defendant’s arrest for Mr. Daniels’ murder. Members of the Chicopee Police Department, the Springfield Police Department and the Massachusetts State Police were acting in cooperation with one another to investigate the murder. At approximately 3:30 a.m. on June 8, 2000, Lieutenant William Jebb (“Lt. Jebb”) of the Chicopee Police Department, accompanied by members of the Springfield Police Department and the Massachusetts State Police, arrested the defendant on the murder warrant. At the time of the arrest, the defendant was asleep in his girlfriend’s home in the Indian Orchard section of Springfield. The defendant was brought to the Chicopee police department by Lt. Jebb. The two men knew each other because of the prior dealings the defen *519 dant had with the Chicopee police. Lt. Jebb knew the defendant’s real name and also knew his street name of “Blackie."
When the defendant and Lt. Jebb arrived at the Chicopee Police Department, the defendant was escorted to a windowless conference room where Trooper Roland Gibbons (“Trooper Gibbons”) of the Massachusetts State Police awaited him. The room in question is somewhat like a lounge, with soda machines and the like present, as well as tables and chairs. Lt. Jebb introduced the defendant to Trooper Gibbons.[1] The trooper produced two identical Miranda warning cards, gave one to the defendant and kept one for himself. He then instructed the defendant to read along and listen as the trooper read the warnings aloud. After reading each warning, Trooper Gibbons stopped and asked the defendant if he understood the warning. Each time, the defendant replied that he understood, and Trooper Gibbons instructed him to place his initials next to the warning that had just been read to him. Instead, the defendant marked an “X” next to each warning. Trooper Gibbons then asked the defendant to sign the bottom of both the front and back of the card. Instead, the defendant simply squiggled a line and made an “X." However, he did write out the date and time on the back of the card. The defendant acknowledged that he understood the Miranda warnings given to him by Trooper Gibbons. The officers then asked if he would like to speak to them. The defendant indicated that he was willing to speak with them, but only after he had spoken with his attorney. Lt. Jebb then asked the defendant the name of his attorney. The defendant replied that it was Attorney Perman Glenn of Springfield, and gave Lt. Jebb Attorney Glenn’s telephone number. At this time, the defendant, although under arrest, had not been booked and had not been given his telephone rights pursuant to G.L.c. 276, §33A. Using the conference room telephone, Lt. Jebb placed a call to Attorney Glenn through the dispatch desk.[2] The dispatcher placed the call to Attorney Glenn’s telephone number; his answering service answered the call. The dispatcher then transferred the call back into the conference room, where Lt. Jebb answered.
Lt. Jebb spoke with Ms. Beverly Washington, the operator for the answering service on duty that night. Lt. Jebb’s version of the call differs dramatically from that to which Ms. Washington testified. Lt. Jebb claims he identified himself and told Ms. Washington that the defendant was in custody at the Chicopee Police Department and wanted to speak to Attorney Glenn and that Attorney Glenn should call the police department. Lt. Jebb then left the police department number with Ms. Washington. According to Lt. Jebb, Ms. Washington responded that it was unlikely that Attorney Glenn could be reached at that late hour but that she would take the message nonetheless.
While Ms. Washington has no independent memory of the actual phone call, she testified to the exact protocol that the answering service operators follow with respect to incoming calls for a client. The contract between the service and the client, here, Attorney Glenn, determines how the call is handled. The service’s contract with Attorney Glenn provided that if any after-hours call came in for him that were in any way urgent or of an emergency nature, he was to be contacted immediately at home or on his cellular phone. The answering service had both numbers on record. The service uses a computer to track the client’s contractual requirements in determining how to respond to a phone call. Based on Attorney Glenn’s contract with the service, had Lt. Jebb or anyone else calling on the defendant’s behalf indicated that he was in custody and urgently needed to speak to his attorney, the answering service would have promptly called Attorney Glenn. Ms. Washington testified that the caller did not have to say explicitly that it was an “emergency” or that the call was “urgent.” Rather, she testified that the operators have some discretion to determine whether Attorney Glenn should be contacted right away, if the overall tone and content of the call lent the inference that there was an emergency.
Ms. Washington’s testimony regarding the answering service protocol was corroborated by the manager of the answering service. Ms. Washington entered the contents of her conversation with Lt. Jebb into the computer log. That log revealed that the call from the Chicopee Police Department was received at 4:35 a. m. The only message left was that Jermaine Hunter was the caller and that the person called was Perman Glenn. The number of the Chicopee Police Department was also recorded. The log also contained a notation of‘best time.” Ms. Washington and her supervisor explained that the operators use this caption to record when the caller is requesting a call back. Under the caption for ‘best time” for the call from Lt. Jebb, the following was recorded: “Re: requesting serivices [sic] call when office open.”
From the evidence, I have no doubt that when Lt. Jebb telephoned the answering service on Mr. Hunter’s behalf, he did not express to the operator that there was any urgency to the call, nor did he express that Mr. Hunter was under arrest for murder and needed to speak with Attorney Glenn. Instead, he simply left a message that Attorney Glenn should call Mr. Hunter at the Chicopee Police Department when Attorney Glenn arrived at his office in the morning.
Despite knowing that the call would not be returned in the near future, Lt. Jebb did not communicate this to Mr. Hunter. Instead, he and Trooper Gibbons gave every appearance that a call would be promptly forthcoming from Attorney Glenn. For approximately twenty minutes the two officers alternately remained in the conference room with the defendant, supposedly awaiting the call the defendant expected from Attorney Glenn. Both Lt. Jebb and Trooper Gibbons acknowledged that because Mr. Hunter invoked his right to counsel, they ceased questioning him with respect to the homicide. However, Trooper Gibbons *520 asked the defendant biographical information. Initially, Lt. Jebb suggested that this information was acquired to prepare the defendant for booking, but by the end of the suppression hearing, it was generally acknowledged that Trooper Gibbons requested the information in order to use it in any statement Mr. Hunter might provide. Indeed, the trooper wrote the information he gained on a SP-12 form, used by the State Police to record statements. Moreover, it was acknowledged that neither Trooper Gibbons nor Lt. Jebb were the booking officers. Indeed, Mr. Hunter was later booked through the normal booking process at the Chicopee Police Department, where the booking officer posed him biographical questions.
During the approximately twenty minutes when the defendant waited for Attorney Glenn’s call, and the officers pretended to wait for the call, the defendant, in' addition to responding to Trooper Gibbons’ biographical questions, kept pressing the officers for details of the murder. As time wore on, the defendant asked the officers to call his father. This was done, and while the three men awaited the father’s arrival, the defendant expressed to Lt. Jebb that he distrusted Trooper Gibbons.[3] The lieutenant assured Mr. Hunter that the trooper was a good person and could be trusted.
At approximately 5:30 a.m., the defendant’s father, Mark Hunter, arrived at the station. He was allowed to meet with his son privately in the conference room for fifteen minutes. When Mark Hunter left the room, he told both Lt. Jebb and Trooper Gibbons that he felt that his son should speak with an attorney. Trooper Gibbons then escorted Mr. Hunter’s father to the front door of the Chicopee Police Department.
While Trooper Gibbons was escorting Mark Hunter from the station, Lt. Jebb remained with the defendant in the conference room. The defendant was nervous and turned to Lt. Jebb, asking “What do you think I should do?” The lieutenant responded by stating that he, the lieutenant, wasn’t there but that the defendant was and that the defendant knew what happened. Lieutenant Jebb then stated “It’s going to go down one of two ways. It’s going to go down as an accident or it’s going down as a murder. You were there, you know what happened. It’s up to you.” Mr. Hunter had not made any statement in response to any part of the lieutenant’s statement up to this point. Trooper Gibbons then reentered, the room and announced to the defendant that he was now going to be formally booked for murder. The defendant started tapping a pad on the table with his finger, and stated repeatedly “Write this down.” Trooper Gibbons sat down and started writing as Mr. Hunter spoke. The officers interrupted the defendant a few times to ask questions. When the statement was completed, Trooper Gibbons read the statement back to Mr. Hunter. When the defendant started to read the second paragraph of the statement, the defendant told him to stop and then as he scratched out a line, he said “no, no I can’t say that.” After the defendant made that correction, the trooper asked him to sign the statement and initial any other corrections. Mr. Hunter signed the statement with an “X,” stating that Attorney Glenn told him never to sign anything. The defendant did write out the date on the bottom of the statement. The defendant then supplemented his statement by saying that at the time the killing occurred, he was not wearing the sneakers then on his feet. The trooper wrote down this additional information, and the defendant marked the supplementation with an “X.” The statement implicated the defendant in the victim’s murder. Trooper Gibbons then asked the defendant whether he was wearing a blue shirt at the time of the incident or whether he knew anything about a blue shirt. The defendant denied wearing a blue shirt at the time of the incident. Trooper Gibbons noted this in another supplementation that Mr. Hunter declined to sign or mark. Once the statement was completed, Lt. Jebb asked Mr. Hunter to turn over his sneakers, and Mr. Hunter did so. In addition, the defendant, Trooper Gibbons and Lt. Jebb drove through the Indian Orchard section of Springfield in a fruitless attempt to find clothing that the defendant claimed he was wearing and then discarded after the murder.
Only after all these events occurred was Mr. Hunter booked at 8:03 a.m., some four and a half hours after his arrest. Lt. Jebb acknowledged that the reason the defendant was not promptly booked after his arrest was because the police hoped to get a confession from him before booking, and that this was “standard procedure.”

DISCUSSION

Because Lt. Jebb and Trooper Gibbons did not scrupulously honor the defendant’s request for counsel, and in fact thwarted the defendant’s ability to confer with counsel so that they could obtain incriminating statements, they have violated the defendant’s Fifth Amendment right to counsel. In addition, the police violated the defendant’s article 12 right to counsel and his state telephone rights. The defendant’s motion to suppress his statements and any derivative evidence is hereby allowed for the reasons stated below.[4]
A. The police did not scrupulously honor the defendant’s right to counsel under the Ffth Amendment.
When a defendant asserts his right to counsel after being read his Miranda rights, his invocation must be scrupulously honored. See Michigan v. Mosley, 423 U.S. 96, 102 (1975); Commonwealth v. Brant, 380 Mass. 876, 882 (1980), citing Miranda v. Arizona, 384 U.S. 436, 474 (1966). See also Commonwealth v. Jackson, 377 Mass. 319, 326 (1979). The court must look at the circumstances in each case to determine whether a defendant’s rights were scrupulously honored. See Commonwealth v. Selby, 420 Mass. 656, 662-63 (1995).
Once a defendant invokes the right to counsel, the police must not re-initiate interrogation unless and until the defendant makes a clear and unequivocal waiver of his right to counsel. See Johnson v. Zerbst, *521 304 U.S. 458, 464 (1938). In most instances, the accused himself must initiate further conversation with the police. See. Arizona v. Roberson, 486 U.S. 675, 677 (1988); Edwards v. Arizona, 451 U.S. 477, 485 (1981). “Waivers of counsel must be a voluntary ... a knowing and intelligent relinquishment of a known right or privilege, a matter which depends in each case ‘upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.’ ” Edwards v. Arizona, 451 U.S. at 482. See also Commonwealth v. Taylor, 374 Mass. 426, 433 (1978). The Commonwealth cannot show a valid waiver by showing “only that he responded to further police-initiated custodial interrogation even if he had been advised of his rights.” Edwards v. Arizona, 451 U.S. at 485.
When considering voluntariness in light of both Fifth Amendment and due process concerns, one factor to consider is whether the police used false information during an interrogation. See Selby at 664 (due process); Jackson, 377 Mass. at 326-27 (Fifth Amendment; “where the police pursue a course of conduct aimed at improperly convincing a defendant to relinquish [his] right, the Commonwealth has neither ‘scrupulously honored’ that right nor has it sustained its burden of showing a knowing, intelligent and voluntary waiver of that right”); Taylor, 374 Mass. at 433 (due process). The Commonwealth bears the burden of proving, beyond a reasonable doubt, that a defendant knowingly, intelligently, and voluntarily waived his rights. See Michigan v. Harvey, 494 U.S. 344, 354 (1990); Commonwealth v. Edwards, 420 Mass. 666, 669-70 (1995); Commonwealth v. Judge, 420 Mass. 433, 447 (1995). In addition, courts indulge every reasonable presumption against waiver. See Johnson v. Zerbst, 304 U. S. at 464; Commonwealth v. Watkins, 375 Mass. 472, 485 (1978); Commonwealth v. White, 374 Mass. 132, 137 (1977). This is so because “suspects who assert their right to counsel are unlikely to waive that right voluntarily in subsequent interrogation,” Arizona v. Roberson, 486 U.S. at 681; rather, “to a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been provided will surely exacerbate whatever compulsion to speak the suspect may be feeling.” Id. at 686.
“Interrogation” or its functional equivalent includes not just outright questioning, but statements and conduct by the police that constitute “subtle coercion” “psychological ploys” and other “techniques of persuasion.” Rhode Island v. Innis, 446 U.S. 291, 296, 299-301 (1980). This is because such ploys can often be more effective than a formal interrogation. See Brewer v. Williams, 430 U.S. 387, 399 (1977).[5] The interrogation must reflect a measure of compulsion above and beyond that inherent in custody itself, see Rhode Island v. Innis, 446 U. S. at 300, but such compulsion includes police actions that are “reasonably likely to elicit an incriminating response from the suspect.” Id. at 301.
Here, Mr. Hunter invoked his right to counsel after Trooper Gibbons read him his Miranda rights. Both Lt. Jebb and Trooper Gibbons understood this to be an invocation of the right to counsel. As set out above, Lt. Jebb then called Attorney Glenn. There was conflicting testimony at the hearing on this motion as to the content of Jebb’s conversation with the answering service. Regardless of whether it could be inferred from the answering service operator’s testimony that Lt. Jebb intentionally failed to tell the answering service that the defendant’s call was urgent, or whether, as Lt. Jebb testified, he did not tell the defendant that Attorney Glenn would not call back until office hours, in either case, he withheld information critical to the defendant’s effective exercise of his right to counsel. Had the defendant known that Attorney Glenn would not call back immediately, then he could have re-evaluated his situation, and might not have been put in tiie situation which led him to make his statements. See Jackson, 377 Mass. at 326-27 (police’s false statement led defendant to make a statement). Lt. Jebb’s withholding this information was part of a “course of conduct aimed at improperly convincing a defendant to relinquish [his] right,” id. at 327, and to “wear down his resistance and make him change his mind” about talking to his attorney. Michigan v. Mosley, 423 U.S. at 106. That improper course of conduct continued after the defendant met with his father. As stated earlier, after Lt. Jebb left the message for Attorney Glenn, he and Trooper Gibbons kept the defendant in the same conference room; they did not book him or place him in a holding cell pending what he thought would be his attorney’s imminent arrival. Cf. Edwards v. Arizona, 451 U.S. at 479 (defendant taken to county jail after requesting an attorney). Either Lt. Jebb or Trooper Gibbons sat in the room with the defendant while the defendant waited for his attorney to call back. While he was waiting, the defendant asked for details of the crime that he was charged with, but Trooper Gibbons refused to give him any information, saying that he would not discuss it with the defendant until his attorney arrived.
While Mr. Hunter was still waiting for Attorney Glenn to call, and the officers pretended to wait for the call, Trooper Gibbons began asking the defendant questions. Though not the central holding, these “booking questions” were interrogation, not in the least part because Lt. Jebb admitted during the hearing on this motion that the defendant was not going to be booked until after the interrogation ended. Trooper Gibbons intended to continue the questioning beyond the biographical information he did obtain from the defendant so that he could obtain a confession. See Brant, 380 Mass. at 883. See also Commonwealth v. Torres, 424 Mass. 792, 798 (1997) (police officer’s intent in asking the questions relevant to determining whether questions reasonably likely to elicit an incriminating statement). In addition, Trooper Gibbons did not follow the booking form used by the Chicopee Police Department. Nor did he offer the answers to his “booking questions” to the booking officer *522 once the interrogation ended. On these facts, the questions were not for booking purposes, and were the functional equivalent of interrogation, as they were a prelude to questions designed to elicit incriminating statements from the defendant. See Pennsylvania v. Muniz, 496 U.S. 582, 601-02 (1990) (establishing the routine booking exception where the police ask “questions to secure the biographical data necessary to complete booking or pretrial services’ ” and where the questions are “reasonably related to the police’s administrative concerns”); Rhode Island v. Innis, 446 U.S. at 301 (what constitutes interrogation or its functional equivalent); Commonwealth v. Woods, 419 Mass. 366, 373 (1995) (setting out the scope of the Massachusetts “routine booking exception” in light of Muniz).
When Attorney Glenn did not call back promptly, as the defendant expected him to, the defendant asked to consult with his father. The officers continued to sit in the conference room with him while he waited for his father to arrive at the station. With the exception of his meeting with his father, the defendant was never out of one of the officers’ presence, and he had no time to reflect on the situation and decide what to do.
After his father left the conference room, the defendant asked Lt. Jebb “What do you think I should do?” This question, under the circumstances, does not represent the defendant’s initiation of conversation amounting to an unequivocal waiver of his previously invoked right to counsel. See Arizona v. Roberson, 486 U.S. at 677; Edwards v. Arizona, 451 U.S. at 485; Johnson v. Zerbst, 304 U.S. at 464; Commonwealth v. Cobb, 374 Mass. 514, 519 (1978). To the contrary, Mr. Hunter’s question was uttered in the police-created context of what appeared, to him, to be a no-show attorney. Moreover, he was concerned about his girlfriend and child, since the officers had told him that they too were in the police’s presence. Mr. Hunter’s uncertainty was further reflected in his asking to speak with his father. His question, uttered immediately after his father left, was not a clear statement that the police could reasonably interpret to mean that he wished to make a statement without counsel being present. Compare Judge, 420 Mass. at 449-51 (during an interrogation, defendant asked if his counsel should be present, was re-read his rights, and then explicitly said he was willing to proceed without counsel). Rather, it was evidence that the defendant was beginning to waver in an atmosphere more coercive than mere police custody. See Rhode Island v. Innis, 446 U.S. at 300.
When the defendant asked Lt. Jebb what he should do, however, Lt. Jebb did not re-read the defendant his rights, or otherwise make sure that Mr. Hunter wished to speak without counsel present. See Brewer v. Williams, 430 U.S. at 405 (police violated right to counsel where police did not re-advise the defendant of his right to counsel, did not attempt to discover whether the defendant intended to waive that right, and interrogated the defendant despite a prior clear assertion of the right to counsel); but see Michigan v. Mosley, 423 U.S. at 104 (police read defendant his rights before second interrogation after defendant’s prior invocation of right to remain silent). Moreover, re-reading the defendant his rights is “standard procedure” in many of our cases.[6] See Commonwealth v. Rankins, 429 Mass. 470 (1999) (a Massachusetts State Police Trooper re-read the defendant his Miranda rights after the defendant made a statement that may have indicated he wished to waive his rights); Nom, 426 Mass. at 157-58 (police officer properly asked question to clarify prior invocation of right to counsel); Torres, 424 Mass. at 793; Selby, 420 Mass. at 664-65; Edwards, 420 Mass. at 671; Commonwealth v. Stroud, 375 Mass. 265, 268 (1978); Taylor, 374 Mass. at 429. Instead, Lt. Jebb’s responded to the defendant’s question by stating that he, the lieutenant, wasn’t there but that the defendant was and that the defendant knew what happened. He then stated “It’s going to go down one of two ways. It’s going to go down as an accident or it’s going down as a murder. You were there, you know what happened. It’s up to you.” This statement presumed the fact that the defendant was present at the murder, and set the limits within which Lt. Jebb was prepared to offer the defendant the “help" he requested. Thus, Lt. Jebb’s response was not meant to clarify the situation for the defendant, or answer a “friend’s” question, as the Commonwealth contends. It was, instead, a re-initiation of the interrogation after the defendant had requested counsel and had not unequivocally waived that request. Jebb’s comment was designed to deliberately elicit an incriminating statement, and was thus the functional equivalent of an interrogation of the defendant. See Rhode Island v. Innis, 446 U.S. at 302, n.7; Brewer v. Williams, 430 U.S. at 399-400 (police did not re-advise the defendant of his right to counsel, did not attempt to discover whether the defendant intended to waive that right, and interrogated the defendant despite a prior clear assertion of the right to counsel); Brant, 380 Mass, at 883. Under the circumstances, “[t]here can be no serious doubt . . . that” Lt. Jebb “deliberately and designedly set out to elicit information from” Mr. Hunter “just as surely as — and perhaps more effectively than — if he had formally interrogated him.” Brewer v. Williams, 430 U. S. at 399. Moreover, Lt. Jebb’s statement, that the defendant had participated in either an accident or a murder was both a promise and a threat of how the defendant would be treated if he gave a statement. See Commonwealth v. Raymond, 424 Mass. 382, 384 (1997) (“police officers may not give an ‘assurance, express or implied, that [confessing] will aid the defense or result in a lesser sentence’ ”). Mr. Hunter’s statement thus came about as a result of police subterfuge and a purposeful attempt to subvert his rights. See Rhode Island v. Innis, 446 U.S. at 296, 299-301; White, 374 Mass. at 136. The circumstances do not indicate that the police made" ‘every effort’ ... to see to it that the defendant *523 did not unknowingly relinquish basic constitutional protections indispensable to a fair trial." Commonwealth v. Hosey, 368 Mass. 571, 578 (1975).
Nor is there evidence that the defendant impliedly waived his rights by consulting with his father and thereafter asking for Lt. Jebb’s advice. See Watkins, 375 Mass. at 484. Indeed, the father confirmed to the police that which the defendant had already indicated, namely, the defendant should consult with counsel before speaking further with the police. Under these circumstances, there was no implied waiver. The defendant’s question to Lt. Jebb, “What do you think I should do?" was not an unequivocal indication that he wished to speak to the police without his attorney present. Compare Commonwealth v. Nom, 426 Mass. 152, 154-56 (1997) (defendant invoked right to counsel, was left alone in interrogation room; when police re-entered room, they said nothing, and defendant then stated “I admit it” and gave a statement after he was re-read his Miranda rights).
The fact that the defendant had been read his Miranda rights before does not preclude a finding that the police violated his asserted right to counsel. The defendant did understand his rights, no doubt in part because he had been read them before. Because he understood his rights, he clearly invoked his right to counsel, and did not clearly waive it when he asked Lt. Jebb what he should do.
The defendant was interrogated in violation of his asserted Fifth Amendment right to counsel.
B. The police violated the defendant’s article 12 right to counsel and statutory telephone right.
The police also violated the defendant’s right to counsel, as guaranteed in art. 12 of the Massachusetts Declaration of Rights. In Commonwealth v. Mavredakis, 430 Mass. 848, 858-62 (2000), the Supreme Judicial Court affirmed that a defendant’s article 12 right to counsel includes an obligation on the part of the police to make known to the defendant “an attorney’s efforts to render assistance.” Id. at 856. Without such knowledge, the defendant cannot make a knowing and intelligent waiver of his rights. Id. at 856, 860. Further, the court stated that “any other approach would lend tacit approval to affirmative police interference with the attorney-client relationship.” Id. at 860. The duty announced in Mavredakis, that the police must “apprise the defendant of a specific communication from his attorney that bore directly on his right to counsel,” surely includes the obligation of the police to contact counsel when a defendant has asked to speak to his attorney but the police control the means by which the defendant can contact the lawyer. Id. at 861. Here, Lt. Jebb knew that Attorney Glenn would not return the telephone call promptly because Lt. Jebb left a message that the call need only be returned when the lawyer’s office opened, yet he didn’t make this information available to the defendant. In fact, as stated earlier Lt. Jebb and Trooper Gibbons behaved in a manner designed to make the defendant believe that Attorney Glenn was going to call back promptly. When the fictional expectation was not realized by the time the defendant’s father left the police station, the defendant was agitated and looking for advice from the very officer who had deflected the defendant’s attempt to have his attorney contacted.
Moreover, the police also violated the defendant’s right to place a telephone call himself pursuant to G.L.c. 276, §33A. When a defendant is arrested he is entitled, as part of the rights attendant to booking, to make a telephone call “for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney . . . Any such person shall be informed forthwith upon his arrival at such station ... of his right to use the telephone, and such use shall be permitted within one hour thereafter.” G.L.c. 276, §33A. The purpose of this statute is clear on its face, and includes the right to engage an attorney to assist him in his dealings with the police. See id.; Commonwealth v. Alicea, 428 Mass. 711, 716 (1999). Depending on the circumstances, the police’s failure to advise the defendant of his right to make a telephone call can be the basis for suppressing evidence. See Alicea, 428 Mass. at 716, citing Commonwealth v. Johnson, 422 Mass. 420, 429 (1996); Commonwealth v. Jones, 362 Mass. 497, 502-03 (1972), Commonwealth v. Bouchard, 347 Mass. 418, 420-21 (1964).
Reading the defendant his Miranda rights may substitute for the c. 276, §33A, right to a telephone call, if the rights specifically mention the defendant’s right to make a telephone call, see Commonwealth v. Painten, 429 Mass. 536, 542 (1999), but here, the rights that Trooper Gibbons read to the defendant, and that the defendant read along with, do not mention the right to make a telephone call.[7] Nor was Mr. Hunter advised of his right to use the telephone “as soon as reasonably practicable” after his arrival at the police station. See Johnson, 422 Mass. at 429; Bouchard, 347 Mass. at 420. Rather, the police waited four and a half hours before advising him of this right.
In Bouchard, the Supreme Judicial Court stated that suppression was unnecessary although “there was undue delay and [the defendant] was not informed of his right forthwith [because] it does not appear . . . that in the meantime he had made any admissions ... If [this] had happened, we might have held that [this] evidence could [not] be introduced against him.” Id. at 420-21. Here, however, the police did intentionally delay booking the defendant, and his right to a telephone call was not read to him “forthwith,” as required by the statute. Lt. Jebb admitted that it is “standard procedure” at the Chicopee Police Department to delay booking a defendant so that they can interrogate him and obtain a confession. Compare Johnson, 422 Mass. at 429 (refusing to suppress evidence where the delay in booking the defendant and informing him of his *524 right to a telephone call was unintentional, and “not designed' to gain inculpatory information”); Stroud, 375 Mass, at 269 (the defendant’s decision to confess was unprompted by any official conduct, and was wholly unrelated to the possible deprivation of his telephone rights; "this was not a situation in which the police intentionally withheld the opportunity to make a telephone call until the defendant confessed”).
The Commonwealth contends that Lt. Jebb effectively granted the defendant’s right by placing the telephone calls to Attorney Glenn and the defendant’s father, but it has failed to cite any authority in support of this contention. A literal reading of the statute does not support this contention. The statute does not say that the police will make a telephone call on the defendant’s behalf; it is his personal right to make a telephone call. See G.L.c. 276, §33A.
Assuming that an effective grant could be read into the statute, there was none in this case. Lt. Jebb did call Attorney Glenn, but he withheld from the defendant the information that the answering service gave him. Without this information, the defendant could not validly waive his right to counsel. Lt. Jebb retained control of the telephone by using the telephone in the conference room. This telephone did not make outgoing calls, and the police dispatcher had to patch the outgoing call through to the conference room. Lt. Jebb never allowed the defendant to speak with or listen to the person on the other end of the line, nor did he tell the defendant what the answering service told him. Compare Edwards v. Arizona, 451 U.S. 477, 479 (1981) (police let the defendant call an attorney himself).
If Lt. Jebb had allowed the defendant to make the telephone call himself, the defendant in all likelihood would have communicated the urgency of the situation to the operator. The operator, pursuant to the service’s contract with Attorney Glenn, would then have immediately called Attorney Glenn. By withholding this information from the defendant, Lt. Jebb prevented him from making a fully informed decision. The entire situation reflects police manipulation and pressure that the assertion right to counsel is designed to relieve. See Miranda v. Arizona, 384 U.S. at 444-45.
If the telephone right is to be meaningful, a defendant must be allowed to make a telephone call himself, and must be allowed to do so promptly, regardless of whether he is booked at that time, and before any interrogation takes place. See Johnson, 422 Mass. at 429; Bouchard, 347 Mass. at 421.[8]
The police’s violations of the defendant’s article 12 and G.L.c. 276, §33A, rights thus provide a supplemental basis on which to suppress the defendant’s statements and any derivative evidence.

ORDER

For the foregoing reasons, the defendant’s statements, and any derivative evidence are suppressed, and the defendant’s motion to suppress is allowed.

 Apparently Trooper Gibbons was present when the defendant was arrested. However, in the excitement of the arrest, the defendant was not aware of all the officers who were present or their identities.

 The conference room telephone could only make in-house calls.

 Trooper Gibbons was not in the room at that time.

 At Lt. Jebb’s request, the defendant handed him the sneakers on his feet after signing his statement. The sneakers and any derivative evidence are accordingly suppressed. Likewise, I suppress any statements that the defendant may have made during the drive around Indian Orchard to look for boots and clothes the defendant allegedly discarded after the crime was committed.
The defendant, in the opening paragraph of his memorandum in support of his motion to suppress, states that the arrest warrant for the defendant did not authorize the police to make a no-knock entry of his girlfriend’s apartment. The Commonwealth, in its memorandum, states that the entry was justified under the exigent circumstances doctrine. Without at least a copy of the arrest warrant in question, this court will not rule on tills argument. To the extent that the defendant still wishes to pursue this issue, he should file a separate motion to suppress, with evidence and legal citations in support thereof.

 Though Brewer v. Williams was decided on Sixth and Fourteenth Amendment grounds, the analysis of the “basic contours” of the right to counsel is the same as that undertaken in Fifth Amendment cases such as Rhode Island v. Innis. See Brewer v. Williams, 430 U. S. at 398.

 This was not always “standard procedure,” since the Chicopee Police Department did book a defendant upon his arrival at the station, and before any interrogation in Commonwealth v. Hosey, 368 Mass. 571, 575 (1975).

 The rights Trooper Gibbons read to the defendant were as follows: “1. Before we ask you any questions, you must understand your rights. 2. You have the right to remain silent. 3. Anything you say can be used against you in court. 4. You have the right to talk to a lawyer for advice before we ask you any questions and to have him present with you during questioning. 5. If you cannot afford a lawyer, one will be appointed for you before questioning if you wish. 6. If you decide to answer questions without a lawyer present, you will still have the right to stop questioning at any time until you talk to a lawyer. 6. Do you understand what I have read to you? 7. Having these rights in mind do you wish to talk to me now?” (Exhibit 1.)
On the other hand, the rights read to the defendant during the booking procedure did state that “At your own expense, You have the right to use a telephone.” (Exhibit 3.)

 The situation here is not unlike that resolved in Commonwealth v. Rosario, 422 Mass. 48, 51-56 (1996), where the police delayed arraigning the defendant so that they could obtain an incriminating statement from him. The Supreme Judicial Court decreed that there is an “unreasonable delay” in arraignment if the defendant makes a statement more than six hours after his arrest. Id. at 56. As yet, there is no particular time period by which an arrested defendant must be booked and given his telephone rights. Here, it is clear that the Chicopee Police Department took advantage of the lack of an explicitly prescribed period to violate the defendant’s rights. Though it is hard to imagine how “forthwith” could reasonably be interpreted to mean a delay of at least four and a half hours, as was the case here, it nonetheless appears to be a vagary the police could exploit.